| | |
|---|---|
| George **RATLEDGE** | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| **v.** | ) Case No.: **1:12-cv-402** |
| | ) |
| **NORFOLK SOUTHERN RY. CO.** | ) District Judge Curtis L. Collier |
| **BULL MOOSE TUBE CO.** | ) Magistrate Judge William B. Carter |
| | ) |
| Defendants | ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT NORFOLK SOUTHERN RAILWAY CO.'S MOTION TO DISMISS**

Comes now the Plaintiff, George Ratledge, by and through counsel, who submits the following response in opposition to the motion to dismiss filed by Defendant Norfolk Southern Railway Company ("NS"). The motion should be denied.

### Statement of the Case / Summary of Argument

Plaintiff has brought three counts against NS. Count One asserts a personal injury claim brought pursuant to the Federal Employers' Liability Act, 45 U.S.C. §§ 51, *et seq*. ("FELA"). (Complaint, Doc.1/¶¶53-57) Count Two asserts a claim for workplace retaliation brought pursuant to § 20109(a) of the Federal Railway Safety Act ("FRSA"). (*Id.* at ¶¶58-61) Count Three asserts a claim for interference with medical treatment brought pursuant to 49 U.S.C. § 20109(c) of the FRSA. (*Id.* at ¶¶62-66) NS only seeks dismissal of Count 2 pursuant to 49 U.S.C. § 20109(f), which states that "[a]n employee may not seek protection under both [§ 20109] and another provision of law for the same allegedly unlawful act of the railroad carrier." NS contends that this statutory defense is applicable in this case on grounds that Plaintiff's appeal of his termination under the procedures set-forth in his collective bargaining agreement ("CBA") allegedly constitutes an attempt to seek protection under the Railway Labor Act, 45 U.S.C. §§ 151, *et seq.* ("RLA").

NS's argument should be rejected for seven reasons. <u>First</u>, Congress specifically *excepted* CBA proceedings from the reach of § 20109(f) under § 20109(g) and/or § 20109(h). Simply put, the specific provisions of subsections (g) and (h) prevail over the general provisions of subsection (f). (*See* Arg. II, *infra*) <u>Second</u>, an appeal of a dismissal pursuant to a CBA does not constitute "seek[ing] protection under ... another provision of law" under subsection (f). (*See* Arg. III, *infra*) <u>Third</u>, this retaliation suit does not pertain to the "same allegedly unlawful act of the railroad carrier" that was at issue in Plaintiff's CBA appeal. (*See* Arg. IV, *infra*) <u>Fourth</u>, the legislative history is clear that subsection (f) was never intended to apply to CBA proceedings. (*See* Arg. V, *infra*) <u>Fifth</u>, NS's arguments are contrary to the decisions of the OSHA Administrative Review Board. (*See* Arg. VI, *infra*) <u>Sixth</u>, NS's arguments are contrary to the Department of Labor's interpretation of the FRSA. (*See* Arg. VII, *infra*) <u>Finally</u>, NS's contention that a contrary ruling would make it subject to conflicting decisions or obligations is not correct. (*See* Arg. VIII, *infra*)

## The FRSA Anti-Retaliation Statute

Count 2 of Plaintiff's complaint asserts that NS, its officers, and/or its employees retaliated against Plaintiff in whole or in part because Plaintiff notified NS that he had a work-related personal injury and that his injury occurred because his workplace was unsafe. (*Id.* at ¶59) This claim is filed pursuant to 49 U.S.C. § 20109, which sets-forth the anti-retaliation provisions of the FRSA. "[T]he intent of [§ 20109] is to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers."[1] It states that "[a] railroad carrier ... may not discharge, ... suspend, ... or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done ... [1] to notify ... the railroad carrier

---

[1] <u>Araujo v. New Jersey</u>, __ F.3d __, n.3, 2013 WL 600208 (3rd Cir. 2013)(*quoting* H.R.Rep. No. 110-259 at 348 (2007); *and citing* <u>Santiago v. Metro-North</u>, ARB No. 10-147, 2012 WL 3255136, **12-14; <u>Norfolk S. Ry. v. Solis</u>, No. 12-0306, 2013 WL 39226, at *3-4 (D. D.C. 2013)).

... of a work-related personal injury ... of an employee"[2] and "[2] for reporting, in good faith, a hazardous safety ... condition."[3]

Unlike many employment anti-retaliation causes of action provided by federal law, the standard of proof for an FRSA retaliation claim only requires the employee to establish that "[t]he circumstances were sufficient to raise the inference that the protected activity ... was a _contributing factor_ in the adverse action."[4] The first U.S. Circuit Court of Appeals opinion in an FRSA retaliation case was issued on 2/13/13 in Araujo v. New Jersey, __ F.3d __, 2013 WL 600208 (3rd Cir. 2013). The Third Circuit held that the "FRSA burden-shifting is much more protective of plaintiff-employees than the [Title VII] McDonnell Douglas framework" because an FRSA plaintiff-employee "need only show that his protected activity was a 'contributing factor' in the retaliatory discharge or discrimination, not the sole or even predominant cause."[5] "In other words, 'a contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.'" _Id._ The Third Circuit quoted the Federal Circuit Court of Appeals about contributing factors:

> The words "a contributing factor" ... mean any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision. This test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a "significant," "motivating," "substantial," or "predominant" factor in a personnel action in order to overturn that action.[6]

The Third Circuit further held that "an employee '_need not_ demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order

---

[2] 49 U.S.C. § 20109(a)(4); _see also_ 29 C.F.R. § 1982.102(b)(1)(iv).

[3] 49 U.S.C. § 20109(b)(1)(A); _see also_ 29 C.F.R. § 1982.102(b)(1)(2)(i)(A).

[4] 29 C.F.R. § 1982.104(e)(2)(iv).

[5] Araujo, 2013 WL 600208 at **5-6 (_quoting_ 49 U.S.C. § 42121(b)(2)(B)(ii); Ameristar Airways v. A.R.B., 650 F.3d 563, 567 (5th Cir. 2011); Allen v. A.R.B., 514 F.3d 468, 476 n.3 (5th Cir. 2008)).

[6] Araujo, 2013 WL 600208 at **5-6 (_quoting_ Marano v. Dep't of Justice, 2 F.3d 1137, 1140 (Fed. Cir. 1993)).

to establish that his disclosure was a contributing factor to the personnel action.'"[7] It explained that while "the fact that an employee need not ascribe a motive to the employer greatly reduces an employee's burden in making a prima facie case" that "this reduced burden is appropriate in FRSA cases" because "the legislative history shows that Congress was concerned that some railroad supervisors intimidated employees from reporting injuries to the FRA, in part, because their compensation depended on low numbers of FRA reportable injuries within their supervisory area."[8] Even though the Third Circuit found "that the evidence that [the employee] proffer[ed wa]s certainly not overwhelming," it held that the district court committed reversible error in entering summary judgment because the employee proved that his protected activity was a contributing factor by producing evidence of temporal connection and disparate treatment.

"An employee prevailing in [an FRSA retaliation action] shall be entitled to all relief necessary to make the employee whole," including (1) reinstatement with the same seniority status that the employee would have had but for the discrimination, (2) backpay with interest, (3) compensatory damages for any special damages sustained as a result of the discrimination, (4) litigation costs, (5) expert witness fees, (6) reasonable attorney fees, and (7) punitive damages in an amount not to exceed $250,000.00.[9]

### The RLA

The RLA mandates that disputes requiring the application or interpretation of an existing collective bargaining argument ("CBA"), *i.e.* "minor" disputes, be "handled in the usual manner" followed, if either party seeks it, by arbitration.[10] The "usual manner" of handling such disputes is

---

[7] Araujo, 2013 WL 600208 at **5-6 (*quoting* Marano, 2 F.3d at 1141 (emphasis in original); *and citing* Coppinger-Martin v. Solis, 627 F.3d 745, 750 (9th Cir. 2010)).

[8] Araujo, 2013 WL 600208 at n.7.

[9] 49 U.S.C. § 20109(e).

[10] 45 U.S.C. §153 (First)(i); Union Pac. v. Bhd. of Locomotive, 130 S.Ct. 584, 591 (2009); Consol. Rail v. Ry. Labor, 491 U.S. 299, 302-303 (1989).

the grievance process that is set out in the applicable CBA. The RLA establishes the procedures for the arbitration.[11] Thus, "the RLA requires employees and carriers, before resorting to arbitration, to exhaust the grievance procedures specified in the [CBA]."[12] Typically, CBAs provide that, when a railroad carrier suspects that an employee has violated an operating rule, for example, it conducts an investigation through a hearing (known as an "on-property hearing" or "on-property investigation") to determine if the employee in fact violated the rule.[13] If the railroad carrier concludes that the employee has violated the rule, the carrier imposes discipline at the conclusion of the hearing. The employee, usually through his union, can then appeal the discipline internally (*i.e.* file a grievance). *Id.* At the conclusion of the grievance process, the employee or the railroad carrier can then pursue arbitration before the National Railroad Adjustment Board ("NRAB") or a Public Law Board ("PLB") established by the railroad carrier and union (collectively the "Adjustment Board").[14] This arbitration does not include fact-finding; rather, it is strictly an appeal of the railroad carrier's decision on the employee's grievance based on the record from the on-property hearing.

### Factual and Procedural History

NS is a common carrier by railroad and conducts shipping by rail in interstate commerce. (Complaint, Doc.1/¶6) It does a substantial amount of business in Tennessee, and maintains an office in Hamilton County at its DeButts Yard facility. (*Id.*) At all times pertinent, Plaintiff was employed by NS as a carman and assigned to the DeButts Yard in Chattanooga. Co-Defendant Bull Moose Tube Company ("BMT") operates a manufacturing facility in Trenton, Georgia, approximately twenty miles from downtown Chattanooga. (*Id.* at ¶8) On 1/7/10, BMT requested that NS send a

---

[11] 45 U.S.C. 153 (First).

[12] Union Pac., 130 S.Ct. at 591.

[13] Bhd. of Locomotive v. Union Pac., 522 F.3d 746, 748 (7th Cir.), aff'd, 130 S.Ct. 584 (2009)

[14] 45 U.S.C. § 153 (First)(i).

carman to inspect its outbound cars that were loaded with its product to be shipped out to its customers; NS deployed Plaintiff to the Trenton facility to perform this task. (*Id.*) Plaintiff had previously inspected shipments at BMT's Trenton plant and would normally enter the facility via large roll up doors designed for tractor trailers. (*Id.* at ¶13) However, when Plaintiff arrived at approximately 11:00 a.m., the large roll up doors were closed due to snow and cold temperatures. (*Id.*) Plaintiff then entered the facility through an entrance door on the right side of the building. (*Id.*) After entering the building, he immediately turned left and took several steps before his head hit a metal support beam. (*Id.* at ¶14) Plaintiff is approximately six feet, four inches (76 inches) tall. (*Id.* at ¶15) The impact of hitting the beam forced his hardhat down toward his shoulders, injuring his head and neck. (*Id.*) Plaintiff's neck, right shoulder, upper back, and right arm and the related bones, disks, ligaments, tendons, vessels, nerves and other tissues thereof were torn, wrenched, herniated, strained, sprained and otherwise injured and damaged; also, prior existing conditions were aggravated. (*Id.* at ¶16)

However, at the time, Plaintiff did not know he was injured; he only thought that he was "rattled" by the impact for a second or two. (*Id.* at ¶17) Although he proceeded to inspect the car, during the rest of the day and evening, Plaintiff's neck felt worse and worse. (*Id.*) The following morning, Friday 1/8/10, Plaintiff arrived for work at 7:00 a.m. and reported the injury to NS Senior General Foreman Terry Sayers. (*Id.* at ¶18) Plaintiff requested to complete the proper injury forms. (*Id.*) Sayers told Plaintiff that he (*i.e.* Sayers) would be fired if Plaintiff filed the injury forms. (*Id.* at ¶19) He told Plaintiff to wait and see if he got better or worse before filling out an injury report. (*Id.*) Plaintiff was afraid if he did not comply with Sayers' instructions that he (*i.e.* Plaintiff) would be fired. (*Id.*) The condition did not improve over the weekend. (*Id.* at ¶20) On Monday, 1/11/10, Plaintiff notified Sayers, once again, about his 1/7/10 injury and that the pain had not subsided. (*Id.*)

Sayers once again told Plaintiff to "wait and see if you get any worse." (*Id.* at ¶21) Sayers also told Plaintiff that if it became necessary to seek medical attention, he should write up the injury as if it had just happened rather than use 1/7/10 as the actual injury date. (*Id.*) In other words, Sayers instructed Plaintiff to falsify the accident report. (*Id.*) Plaintiff also discussed his injury with NS General Foreman Robert Steed on 1/11/10, who told Plaintiff that he would discuss this matter with Sayers. (*Id.* at ¶22) Plaintiff continued to work, with pain, that Monday and the next day, Tuesday, 1/12/10. (*Id.*)

On the morning of Wednesday, 1/13/10, Plaintiff told Sayers that he had to seek medical attention as his right arm was now numb and tingling. (*Id.* at ¶23) Sayers notified Kevin Krull, NS Division Manager of Mechanical Operations. (*Id.*) Plaintiff completed the NS required personal injury report using the correct injury date, not a falsified date, and was transported to a medical facility for treatment. (*Id.*) On 1/13/10, Michael Gaither, NS's doctor, treated Plaintiff at Work Force Corporate Health Services. (*Id.* at ¶24) Dr. Gaither's assessment included: (1) degenerative disk disease in the cervical spine; (2) right shoulder pain; (3) muscle spasm; and (4) head contusion questionable concussion. (*Id.*) Plaintiff's treatment plan included prescriptions for Naprosyn, Flexeril, Lortab, and a CT scan. (*Id.*) Dr. Gaither was concerned that there may be a possible subdural hematoma. (*Id.*) Plaintiff was released to return to work with restrictions. (*Id.* at ¶25) The restrictions included no pushing, no pulling, no lifting over 15 pounds with the right arm, no lifting with outstretched right arm, and limited use of the right arm. (*Id.*)

After Plaintiff returned from the doctor on 1/13/10, Krull, Sayers, Steed, and other NS managers interrogated for 45 minutes about the events that resulted in the injury. (*Id.* at ¶26) These managers then initiated an "investigation" to identify the cause of the injury. (*Id.*) Even though Plaintiff had just returned from obtaining medical treatment, he was required to participate in the

investigation. (*Id.* at ¶27) Plaintiff was also required to wear his full protective gear, including his hard hat. (*Id.*) Management measured Plaintiff's height while he was wearing his safety boots and hard hat. (*Id.*) Management measured him to be 79.5 inches from the floor to the top of his hard hat. (*Id.*) NS measured Plaintiff in a "slouched" position, to mimic the position management thought he would have been in when he struck the support beam. (*Id.*) After the interrogation was completed, Krull informed Plaintiff that NS would not be able to accommodate his doctor's restrictions and that "he would be unable to return to work until [NS's] Medical Department cleared his return." (*Id.* at ¶28) NS placed Plaintiff out of service on that day. (*Id.*)

Later that afternoon, Krull, Sayers, and Steed went to BMT's Trenton facility to conduct an on-scene investigation. (*Id.* at ¶29) They measured the distance from the floor to the bottom and top segments of the support beam. (*Id.*) They noted that the distance from the floor to the bottom of the support beam was 71.75 inches, while the distance from the floor to the top of the support beam was 74 inches. (*Id.*) Based on these measurements, they concluded that the support beam should have hit the Plaintiff at eye level rather than on his hard hat. (*Id.*) They also observed cobwebs on the support beam but did not observe any white residue from the hard hat. (*Id.* at ¶30) As part of their investigation, they struck Krull's hard hat against a similar (but not the same) support beam, and said they observed white residue on the beam from Krull's hard hat. (*Id.*) Krull concluded that Plaintiff could not have sustained an injury in the manner he reported. (*Id.* at ¶31)

Plaintiff was suspended pending a formal disciplinary investigation. (*Id.*) On 1/15/10, Plaintiff received a termination charge letter with two specific charges: (1) failure to properly and timely report an injury in violation of General Rule N; (2) falsification of an injury. (*Id.* at ¶32) When Krull later discovered that Sayers and Steed prevented Plaintiff from filing his injury in a timely manner, the charge of late reporting was dropped. (*Id.*) However, Krull continued to pursue

the charge of injury falsification. (*Id.*)

On 3/17/10, pursuant to § 20109 of the FRSA and the U.S. Department of Labor's implementing regulations set forth at 29 C.F.R. Part 1982, Plaintiff filed a complaint for retaliation with the Regional Director of Occupational Safety & Health Administration ("OSHA"). (*Id.* at ¶44) The complaint as amended alleged that NS retaliated against him for reporting his injury and the safety defect at BMT and interfered with his medical treatment in violation of the FRSA. (*Id.* at ¶44) Furthermore, because Plaintiff remains physically disabled from his normal and customary railroad job, he filed a personal injury lawsuit against NS and BMT in the Circuit Court of Hamilton County Tennessee on 8/26/10 asserting the same personal injury claims that are set-forth in Counts 1 and 4 of the complaint in this case (See Case No.: 10C1062). (*Id.* at ¶57) Plaintiff's attorney and Dr. Tyler A. Kress, Ph.D., CIE, CXLT, a board certified industrial ergonomist, certified XL tribometrist, and safety engineer and biomechanical engineer hired by Plaintiff to evaluate the causes of his injury, attempted to gain, but were denied, access to BMT's Trenton facility to take measurements, examine the scene, and conduct their own investigation. (*Id.* at ¶34)

NS's termination hearing pursuant to the charge letter was postponed seven (7) times due to Plaintiff's ongoing medical treatment. (*Id.* at ¶35) On 9/9/10, the formal hearing took place with Plaintiff's participation. (*Id.*) Plaintiff could not be, and was not, represented by counsel at the hearing. (*Id.*) At the hearing, Plaintiff submitted an affidavit from Dr. Kress outlining his investigation and findings. (*Id.*) Dr. Kress affidavit explained that Plaintiff's height decreased three inches (3") while walking during regular stride, which brings the "effective height" of the lower part of the hard hat to 71", which is the same height noted by the NS's measurement from the floor to the bottom side of the support beam. (*Id.* at ¶36) Dr. Kress further stated that since it is common knowledge that people may slump and/or tilt downward, the "effective height" of the lower part of

the hard hat could even be less than 71", during normal ambulation. (*Id.*) He concluded that even if the lower rim of the hard hat was 71" from the ground, Plaintiff would hit the bar with his hard hat. (*Id.*) In so doing, he used NS's numbers indicating that the height of the subject bar is 71.75" (bottom of bar) to 74" (top of bar). (*Id.*) Dr. Kress' affidavit also concluded that, contrary to NS's position regarding the lack of white residue from Plaintiff's hard hat on the support beam, "Hard direct impacts onto metal by hard hats rarely leave discernible visual or "naked eye" evidence." (*Id.*) Dr. Kress further stated that "most hard hats are made of thermoplastics (such as polyethylene) and have been for decades" and that "they are manufactured via an injection molding process with polyethylene pellets of which a small percentage are colorant pellets." (*Id.*) According to Dr. Kress, "[i]mplying that the hard hat did not hit the subject metal bar as [Plaintiff] walked into it because there was "no hard hat residue found" is definitely not appropriate. (*Id.*) Nevertheless, the formal NS investigation found Plaintiff guilty of falsifying the injury and, on 10/8/10, NS terminated Plaintiff from his employment. (*Id.* at ¶38) As a result, on 10/13/10, Plaintiff filed an amended complaint with the OSHA Regional Director, notifying the agency that NS's retaliation had culminated in a termination. (*Id.* at ¶44)

Prior to the NS hearing, Plaintiff had filed a separate complaint with the Federal Railroad Administration ("FRA"). (*Id.* at ¶33) On 11/29/10, the FRA informed Plaintiff that NS had violated 49 C.F.R. Part 225.33(1) when Plaintiff was "harassed and intimated by Norfolk Southern from 1/7/10 through 1/13/10. (*Id.* at ¶39) "It further stated that NS "violated Title 49 C.F.R. Part 225.33(i) when they did not allow [Plaintiff] to report [his] initial injury when it occurred on [1/7/10]." (*Id.*) The FRA also found that NS violated 49 C.F.R. 225.11 when it failed to document the on the job injury on its FRA required monthly report of all reportable accidents/incidents that occurred. (*Id.*)

On 11/30/10, pursuant to the rules of CBA, Plaintiff's union representative filed an appeal

of Plaintiff's dismissal with Mr. D.L. Kerby, NS's Director for Labor Relations. (*Id.* at ¶40) The appeal stated that the investigative hearing was not fair and impartial and therefore violated the general requirements of Rule 29 of the CBA. (*Id.*) NS denied Plaintiff's appeal on 1/28/11. (*Id.* at ¶41) Plaintiff then appealed to the Public Law Board. (*Id.* at ¶42)

On 6/21/11, the PLB concurred with the guilty decision, but found that a permanent dismissal was unwarranted. (*Id.* at ¶42) Noting that Plaintiff had almost 40 years of service with a clean disciplinary record, the Board ordered reinstatement to service with seniority unimpaired but without any payment for time lost. (*Id.*) This finding suggests that NS, through its various avenues of investigative hearings and subsequent appeal reviews, disregarded the measurements, calculations and assessment of Dr. Kress, a qualified and certified expert, while placing greater value on the measurements and conclusions of a supervisor (Kevin Krull) who has no expertise in the area of biomechanics and did not hire an independent expert to assist with the investigation. (*Id.* at ¶43)

On 7/18/12, the OSHA Regional Administrator entered findings in favor of Plaintiff on his FRSA retaliation complaint and awarded him compensatory and punitive damages, attorneys fees, and other relief. (*Id.* at ¶48) The OSHA Regional Director found that:

> The preponderance of the evidence indicates that [Plaintiff], who had almost 40 years of service with no prior disciplinary action, was subjected to severe emotional anguish and distress during the suspension period and after dismissal. [Plaintiff] was subjected to an investigative hearing that was neither fair nor impartial. Moreover, [Plaintiff] was subjected to an accident investigation immediately after returning from the hospital. [NS] directly targeted [Plaintiff] because of his injury report and humiliated him for doing so. [NS] wanted to make [Plaintiff] an example of what would happen if an employee reports an injury, causing mental anguish. Although the [PLB], after two appeals, ordered [Plaintiff] to be reinstated, [Plaintiff's] personnel records still reflect the suspension. Therefore full restitution was not attained. [Plaintiff's] record remains tarnished, which will undoubtedly hinder any opportunities for employment with other companies, if he is able and so chooses to.

> [Plaintiff's] current physical conditions prevent him from ever returning to the position he held. Therefore, the Department is not ordering reinstatement or back pay given the fact that [Plaintiff] is medically unable to return to work at full capacity.

-11-

[NS's] immediate retaliation against [Plaintiff] for reporting the January 7, 2010 injury exhibited reckless disregard for the law and total indifference to [Plaintiff's] statutorily-protected rights. [NS's] retaliatory conduct towards employees that report injuries and/or illnesses has created a chilling effect in the workplace. On several previous occasions, OSHA has cited [NS] for violating the whistleblower protection provisions of FRSA. Respondent's continued callous disregard for [Plaintiff's] and other employees' protected rights under FRSA warrants significant punitive damages.

(PX1/p.9) On or about 8/8/12, NS objected to the findings and requested a hearing before the Office of Administrative Law Judges ("OALJ") of the U.S. Department of Labor. (_Id._ at ¶49)

On 10/23/12, Plaintiff gave notice to the OALJ of his intent to file this lawsuit in this Court pursuant to 49 U.S.C. § 20109(d)(3) and 29 C.F.R. § 1982.114(a). (_Id._ at ¶50) Before filing suit, Plaintiff voluntarily dismissed his Tennessee Circuit Court personal injury action on 11/27/12 without prejudice pursuant to T.R.C.P. 41, and said dismissal was entered by the Court on 11/29/12. (_Id._ at ¶52)

## **Legal Argument**

Before turning to the reasons why NS's motion should be denied, Plaintiff first shows that NS has really filed a motion for summary judgment on an affirmative defense, not a motion to dismiss for lack of personal jurisdiction. (_See_ Arg. I, _infra_). Thereafter, Plaintiff shows why its motion for summary judgment should be denied. (_See_ Arg. II thru VIII, _infra_) Although Plaintiff can agree to the basic factual contention that he appealed his dismissal pursuant to the CBA, NS is not entitled to summary judgment its election of remedies affirmative defense because § 20109(f) is inapplicable as a matter of law. Indeed, if any party is entitled to summary judgment on the § 20109(f) affirmative defense, the statutory rules of construction employed by the federal courts show that Plaintiff is entitled to a partial summary judgment that this affirmative defense does not apply as a matter of law.

I.      **NS Filed a Rule 56 Motion, Not a Rule 12(b)(1) Motion.**

NS's overarching contention is that Count 2 should be dismissed pursuant to 49 U.S.C. § 20109(f) because Ratledge appealed his dismissal to NS and the PLB pursuant to his CBA. (NS Motion to Dismiss, Doc.16/p.1) Section 20109(f) states that "[a]n employee may not seek protection under both [§ 20109] and another provision of law for the same allegedly unlawful act of the railroad carrier." Before turning to the reasons why NS's argument is incorrect, it is first important to note that although NS couches its motion as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), it is really a Rule 12(b)(6) motion to dismiss for failure to state a claim. The two concepts, of course, are distinct -- "the former determines whether the plaintiff has a right to be in the particular court and the latter is an adjudication as to whether a cognizable legal claim has been stated."[15] NS would have this Court hold that the applicability, if any, of subsection (f) takes away this Court's subject matter jurisdiction. Such a construction is incorrect as a matter of law.

The Supreme Court has held that "[n]ot all mandatory prescriptions, however emphatic, are ... properly typed jurisdictional."[16] "Subject-matter jurisdiction properly comprehended ... refers to a tribunal's power to hear a case." *Id.* "In contrast, a claim-processing rule, ... even if unalterable on a party's application, does not reduce the adjudicatory domain of a tribunal and is ordinarily forfeited if the party asserting the rule waits too long to raise the point." *Id.* For example, the Court has held that the provision in Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII") that requires complainants to file a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") before proceeding to court is not a jurisdictional requirement.[17] It has also held that the Title VII provision that exempts employers that engage fewer than 15

---

[15] Wright, *et al.*, 5B Federal Practice and Procedure, §1350 (3rd ed. 2004).

[16] Union Pac., 130 S.Ct. at 596.

[17] Zipes v. Trans World, 455 U.S. 385, 393 (1982).

employees is not a jurisdictional requirement.[18] In so holding the Court warned:

> "Subject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief-a merits-related determination." Judicial opinions ... "often obscure the issue by stating that the court is dismissing 'for lack of jurisdiction' when some threshold fact has not been established, without explicitly considering whether the dismissal should be for lack of subject matter jurisdiction or for failure to state a claim." We have described such unrefined dispositions as "drive-by jurisdictional rulings" that should be accorded "no precedential effect" on the question whether the federal court had authority to adjudicate the claim in suit.
>
> ...
>
> [C]ourts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party. Nothing in the text of Title VII indicates that Congress intended courts, on their own motion, to assure that the employee-numerosity requirement is met.
>
> ...
>
> Of course, Congress could make the employee-numerosity requirement "jurisdictional," just as it has made an amount-in-controversy threshold an ingredient of subject-matter jurisdiction in delineating diversity-of-citizenship jurisdiction under 28 U.S.C. 1332. But neither § 1331, nor Title VII's jurisdictional provision, 42 U.S.C. § 2000e-5(f)(3)(authorizing jurisdiction over actions "brought under" Title VII), specifies any threshold ingredient akin to 28 U.S.C. 1332's monetary floor. Instead, the 15-employee threshold appears in a separate provision that "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." Given the "unfair [ness]" and "waste of judicial resources" entailed in tying the employee-numerosity requirement to subject-matter jurisdiction, we think it the sounder course to refrain from constricting 1331 or Title VII's jurisdictional provision, 42 U.S.C. § 2000e-5(f)(3), and to leave the ball in Congress' court.[19]

The Court then pronounced the following rule to be used in future cases:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

_Id._

---

[18] Arbaugh v. Y&H Corp., 126 S.Ct. 1235, 1238-1245 (2006).

[19] Arbaugh, 126 S.Ct. at 1238-1245.

Here, the FRSA retaliation cause of action is set forth in 49 U.S.C. § 20109. Subsection (d)(3) provides this Court with subject matter jurisdiction over FRSA retaliation claims. It states that "if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy, and which action shall, at the request of either party to such action, be tried by the court with a jury." Nothing in subsection (d) or subsection (f) that indicates that subsection (f) was intended to be a statutory limitation on subject matter jurisdiction. To the contrary, if anything, subsection (f) merely appears to set out an affirmative defense to an FRSA retaliation cause of action.

This is supported by how election of remedies arguments are treated by the federal courts. While the common law election of remedies doctrine has been banned by the Federal Rules of Civil Procedure,[20] the argument can still be made when provided by statute. In those situations, the federal courts have uniformly held that a statutory election of remedies argument constitutes an affirmative defense, which must be pleaded and proved by a defendant to come into play.[21] Similarly, federal courts have held that an exhaustion of remedies argument is not a jurisdictional bar, but an affirmative defense.[22]

---

[20] 35A C.J.S. Federal Civil Procedure, § 478 ("[t]he doctrine of election of remedies has no application under the Federal Rules of Civil Procedure, and motions to require an election before trial between inconsistent claims or defenses will not be granted").

[21] Bagwell v. Susman, 165 F.2d 412, 415 (6th Cir.1947); Veneklase v. Bridgewater Condos, 670 F.3d 705, 715 (6th Cir. 2012); Donner v. Alcoa, __ F.3d __, 2013 WL 811606 (8th Cir. 2013); Laber v. Harvey, 438 F.3d 404, n.22 (4th Cir. 2006); James Constr. v. Trinity Indus., 644 F.2d 525, 530 (5th Cir. 1981); Kuhl v. Hayes, 212 F.2d 37, 39 (10th Cir. 1954); Medcom Holding v. Baxter Travenol, 984 F.2d 223, 228 n.2 (7th Cir. 1993).

[22] McKnight v. Gates, 282 Fed. Appx. 394 (6th Cir. 2008); Hedges v. U.S., 404 F.3d 744 (3rd Cir. 2005); Eby Constr. v. Dallas Area, 369 F.3d 464 (5th Cir. 2004); Ziemba v. Wezner, 366 F.3d 161, 163 (2nd Cir. 2004); Wyatt v. Terhune, 315 F.3d 1108 (9th Cir. 2003).

Therefore, this case is controlled by Rule 12(b)(6) and not Rule 12(b)(1). Because NS filed evidence with its Rule 12(b)(6) motion, it has been converted to a motion for summary judgment controlled by Rule 56. Therefore, this Court should not grant NS's motion on its election of remedies affirmative defense unless it has proven that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Indeed, it appears that NS already understands that it is really presenting a summary judgment motion.[23]

## II. The Specific Provisions of Subsections (g) and (h) Prevail over the General Provisions of Subsection (f).

This Court should deny summary judgment to NS on its statutory election of remedies affirmative defense. The election of remedies statute at issue, § 20109(f), states that "[a]n employee may not seek protection under both [§ 20109] and another provision of law for the same allegedly unlawful act of the railroad carrier." NS's contention that this statutory defense is applicable in this case on grounds that Plaintiff's CBA appeal constitutes an attempt to seek protection under the RLA (NS Brief, Doc.17/pp.1-2) is without merit because Congress specifically *excepted* CBA proceedings from the reach of subsection (f) under subsections (g) and (h).

"[I]t is a commonplace [rule] of statutory construction that the specific governs the general."[24] "That is particularly true where, as in [§ 20109], Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions."[25] The specific governs the general "particularly when the two are interrelated and closely positioned, both in fact being parts of [the same statutory scheme]."[26] "The general/specific canon is perhaps most frequently applied

---

[23] NS Motion to Dismiss, Doc.16/p.2 ("[t]here is no genuine dispute as to these facts, and NSR[C] is entitled to judgment as a matter of law").

[24] Morales v. Trans World, 504 U.S. 374, 384 (1992).

[25] RadLAX Gateway v. Amalgamated Bank, 132 S.Ct. 2065, 2070-2071 (2012).

[26] HCSC-Laundry v. U.S., 450 U.S. 1, 6 (1981).

to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission."[27] "To eliminate the contradiction, the specific provision is construed as an exception to the general one." *Id.* "[T]he canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one, "violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *Id.*

While subsection (f) generally states that "[a]n employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier," Congress included two exceptions to this rule. First, subsection (h) states that "[n]othing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any Federal or State law or under any collective bargaining agreement." Here, NS's construction of subsection (f) would certainly "diminish the rights, privileges, or remedies of [Plaintiff] ... under [his] collective bargaining agreement." Therefore, subsection (f) must give way. Second, subsection (g) states that "[n]othing in this section preempts or diminishes *any other* safeguards against discrimination, demotion, discharge, suspension, threats, harassment, reprimand, retaliation, or any other manner of discrimination provided by Federal or State law." Thus, to the extent NS's argument that Plaintiff's CBA appeal constitutes an attempt to seek protection under the RLA is accepted by this Court, subsection (f) cannot "diminish" such "safeguards."

This construction is consistent with existing law. The Supreme Court has long held that while all disputes requiring the application or interpretation of a CBA (*i.e.* a breach of contract claim) must be handled following the procedures set forth in the RLA (*i.e.* arbitration)[28] such claims that are independent of a CBA and that do not require the interpretation or application of a CBA are not

---

[27] <u>RadLAX Gateway</u>, 132 S.Ct. at 2071.

[28] <u>Andrews v. Louisville & Nashville</u>, 406 U.S. 320, 325 (1972).

preempted by the RLA and may be brought in other forums.[29] Simply put, an FRSA retaliation claim is a claim that does not require the interpretation or application of a CBA.

The fact that subsections (g) and (h) were enacted in 2007 and what is now subsection (f) was enacted in the early 1980s does not matter. "[A] more specific statute will be given precedence over a more general one, regardless of their temporal sequence."[30] If anything, the fact that subsections (g) and (h) were enacted by Congress in 2007 at the same time it created the current FRSA retaliation cause of action gives greater strength to Plaintiff's argument, not the other way around. Subsections (g) and (h) and the FRSA cause of action (*i.e.* subsections (a) thru (d)) were enacted by Congress as part of the 9/11 Commission Act of 2007. Although this 2007 Act retained subsection (f) from the 1980 version of the FRSA, it transferred authority for rail employees' whistleblower claims from the Adjustment Board (*i.e.* the NRAB and/or PLB) to OSHA and created new rights, remedies, and procedures. Under the old FRSA, the NRAB had jurisdiction to issue a final decision in "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements."[31] However, the 2007 Amendments stripped the NRAB of authority to resolve FRSA whistleblower complaints and transferred that authority to the Labor Department. Although Congress did not want to repeal subsection (f), it did not want it to stand in the way of a railroad employee's ability to prosecute his FRSA retaliation claims either within the Department of Labor administrative courts or in U.S. District Court. The House Conference Committee report characterizes the 2007 Amendments as an attempt to "enhance[ ] administrative and civil remedies for employees" and "to ensure that employees can report their

---

[29] Hawaiian Air v. Norris, 512 U.S. 246, 257-259, 266 (1994); Atchison, Topeka v. Buell, 480 U.S. 557, 564-565 (1987).
[30] Busic v. U.S., 446 U.S. 398, 406 (1980).
[31] 45 U.S.C. § 153(h)(1).

-18-

concerns without the fear of possible retaliation or discrimination from employers."[32] Therefore, it can be inferred that Congress specifically created the subsection (g) and (h) exceptions to allow a railroad employee to pursue any and all remedies provided by his/her CBA without jeopardizing his ability to pursue his FRSA retaliation claim. NS's construction taken to its logical (or rather illogical) conclusion would require the Court to hold that Congress -- which (1) had already determined that the old system of allowing retaliation to be resolved via CBA arbitration no longer worked and (2) had already created a new cause of action with improved remedies designed to protect employees from retaliation -- allegedly intended to allow its new and enhanced protections to be thwarted by the very system that it wanted to supplant in the first place. In other words, the very reason Congress passed the 2007 legislation was because the old way (*i.e.* allowing retaliation to be remedied through CBA arbitration) was not working. If NS's construction of the FRSA were accepted, however, it would ignore the very reason Congress amended the FRSA. Such a construction is nonsensical.

## III.    Appealing a Dismissal Pursuant to a CBA Does Not Constitute "Seek[ing] Protection under ... Another Provision of Law."

In addition and in the alternative, subsection (f) is not applicable in this case because an employee appealing a dismissal under the procedures set-forth in his/her CBA does not constitute an attempt to seek protection under "another provision of law." In anything, it is only an attempt to seek protection under protections negotiated by contract. The Fourth Circuit has held that the "another provision of law" phrase "refers to federal statutes or regulations, not the common [non-statutory] law remedies of the fifty states."[33] Pursuit of a claim or remedy provided by contract, therefore, would not constitute seeking protection under "another provision of law." NS's contention that by utilizing remedies provided by his/her CBA the employee is really attempting to seek

---

[32] H.R. Rep. No. 110-259, at 348 (2007).

[33] Rayner v. Smirl, 873 F.2d 60, 66 n.1 (4th Cir. 1989).

protection under the RLA is incorrect. The RLA only establishes the procedures for challenging a discharge or a disciplinary decision.[34] In other words, while the RLA mandates that such an employee's breach of contract action be submitted to a particular forum (*i.e.* arbitration), it does not control the substantive law that applies to the claim. Stated differently, the process or mechanism for challenging a discharge or disciplinary decision is distinct from the substantive right provided for in the CBA that the employee is seeking to enforce or vindicate. The Supreme Court explained this principle in an early case interpreting the RLA:

> The [RLA], like the National Labor Relations Act, does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be reached with respect to them. The national interest expressed by those Acts is not primarily in the working conditions as such. So far as the [RLA] itself is concerned these conditions may be as bad as the employees will tolerate or be made as good as they can bargain for. The [RLA] does not fix and does not authorize anyone to fix generally applicable standards for working conditions. The federal interest that is fostered is to see that disagreement about conditions does not reach the point of interfering with interstate commerce.[35]

Therefore, a provision in a CBA requiring just cause to discipline or discharge an employee is not a provision that is required by the RLA. It is a provision which the parties negotiated to include in the CBA. Therefore an arbitration action to enforce that right is not a claim to enforce a provision of the RLA. While the RLA dictates how an employee can enforce that right, the right itself is independent of the RLA and the RLA does not guide the interpretation of whether that right has been violated. The CBA, not the RLA, creates the right that the employee is seeking to enforce, namely that the discharge or discipline must adhere to the terms of the CBA. Consequently, an employee challenging a discharge or discipline is seeking substantive protection under the common law of

---

[34] 45 U.S.C. § 153 (First)(i)(disputes may be handled in the "usual manner" (*i.e.* internal appeal process) and if not resolved, either party may seek arbitration (*i.e.*, appeal) before the Adjustment Board); Hawaiian Airlines, 512 U.S. at 252 ("the RLA establishes a mandatory arbitral mechanism" to handle disputes arising out of the application or interpretation of CBAs).

[35] Terminal R.R. v. Bhd. of R.R., 318 U.S. 1, 6 (1943) .

contracts, not under the RLA. Because contract law is non-statutory common law, it is not "another provision of law" within the meaning of § 20109(f).

The Seventh Circuit reached a similar conclusion in <u>Graf v. Elgin, Joliet & Eastern</u>, 697 F.2d 771 (7th Cir. 1983), where a railroad employee alleged wrongful discharge, which the court interpreted as a claim that the railroad carrier violated the CBA. The Court concluded that this claim did not arise under the RLA, noting that while a claim alleging a violation of the RLA would support federal question jurisdiction, a claim alleging a violation of a CBA is not the same as a claim alleging a violation of the RLA. Significant to the issue here, it held that "the fact that an activity is regulated by a federal statute, as collective bargaining in the railroad industry is regulated by the [RLA]" does not mean "that disputes between private parties engaged in that activity arise under the statute."[36]

Also consider <u>Jackson Transit v. Local Div. 1285</u>, 457 U.S. 15, 16, 29 (1982), which concluded that the Urban Mass Transportation Act ("UMTA"), which required state or local governments to make agreements with transit workers to preserve existing CBAs as a precondition to receiving federal assistance in acquiring a private transit company, did not create a federal cause of action to support federal jurisdiction for breaches of such agreements or CBAs. The Court rejected the argument that such agreements and CBAs were creations of federal law by virtue of the UMTA and that the rights and obligations in those contracts were federal in nature. While the UMTA required "fair and equitable" agreements, required approval by the Secretary of Labor, and specified that protective provisions that had to be included in the agreements, the Court noted that such contracts between transit workers and local governments were still to be governed by state law and not federal law. Thus, even where a federal statute governs certain aspects of labor contracts,

---

[36] 697 F.2d at 776.

disputes over those contracts do not necessarily arise under the federal statute.

The purpose of the RLA supports this conclusion. The RLA states that its purpose is, among other things, "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein [and] to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions."[37] The Supreme Court has summarized the RLA's purpose as "promot[ing] stability in labor-management relations by providing a comprehensive framework for resolving labor disputes."[38] It achieves this goal by establishing mandatory dispute resolution _mechanisms_,[39] not by changing the substantive law. Therefore, the RLA imposes procedural obligations, for example, the duty "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working condition, and to settle all disputes,"[40] the requirement that disputes be considered expeditiously,[41] and provides procedural rights such as, for example, employees' right to designate representatives without interference or coercion.[42] Additional RLA provisions show that the RLA establishes the process by which disputes are resolved, not the substantive law that controls the decision.[43] None of these provisions affect the substantive law controlling the merits of a claim under

---

[37] 45 U.S.C. § 151a.

[38] Hawaiian Airlines, 512 U.S. at 252; _and see_ Int'l Bhd. v. Foust, 442 U.S. 42, 42 (1979)(the RLA's goal "is to facilitate collective bargaining and to achieve industrial peace").

[39] Hawaiian Airlines, 512 U.S. at 252.

[40] 45 U.S.C. § 152 (First).

[41] 45 U.S.C. § 152 (Second).

[42] 45 U.S.C. § 152 (Third).

[43] Specifically, the RLA states that employees have the right to organize and bargain collectively through representatives of their own choosing; railroad carriers are barred from requiring prospective employees to join or not join a labor organization; upon the request of employees or railroad carriers, their respective representatives must confer concerning disputes arising out of grievances or the interpretation or application of agreements; railroad carriers and employee representatives are circumscribed in their ability to change the rates of pay, rules, or working conditions embodied in the agreements; railroad carriers must notify employees how all disputes will be handled; the National Mediation Board shall resolve any disputes regarding who the employees' designated representatives are; a railroad's willful refusal to comply with certain terms of the RLA is a misdemeanor; and union shop agreements are permissible. 45 U.S.C. § 152 (Fourth thru Eleventh)

the CBA. Therefore, an employee cannot be deemed to be seeking protection under the RLA; rather the employee is seeking protection under the CBA.

Plaintiff's Counsel has found no case where any court has equated a substantive right provided in a CBA with a right required by the RLA. Indeed, as noted above, the Supreme Court recognized that the RLA does not establish what the working conditions must be.[44] Rather, the "heart" of the RLA is the duty "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working condition, and to settle all disputes."[45] It therefore logically follows that the significant RLA cases address the procedures required by the RLA.[46]

NS's reliance on <u>Norfolk & Western v. Am. Train</u>, 499 U.S. 117 (1991) for the proposition that the RLA constitutes "another provision of law" upon which a railroad employee can seek shelter (NS Brief, Doc.17/pp.13-14) is misplaced. In that case, the U.S. Supreme Court addressed the authority of the Interstate Commerce Commission ("Commission") to approve railroad consolidations under the Interstate Commerce Act ( "ICA"). The ICA provided that a railroad carrier participating in a Commission-approved consolidation is "exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that [railroad] carry out the transaction[.]"[47] The Court concluded that the exemption in section 11341(a) from "all other law" exempted a railroad carrier from its legal obligations under the RLA, which extended to the carrier's

---

[44] <u>Terminal R. Ass'n</u>, 318 U.S. at 6.

[45] <u>Bhd. of R.R. v. Jacksonville Terminal</u>, 394 U.S. 369, 377-378 (1969)(citing 45 U.S.C. 152 (First); *and see* <u>Consol. Rail</u>, 491 U.S. at 310 ("core duties imposed upon employers and employees by the RLA" are "to make and maintain agreements and to settle all disputes"); <u>Virginia Ry. v. Sys. Fed'n</u>, 300 U.S. 515, 542-543, 548 (1937)(RLA encourages resolution of labor disputes in expeditious and least disruptive fashion).

[46] <u>Int'l Ass'n v. Central Airlines</u>, 372 U.S. 682, 695 (1963)(because the RLA imposed the requirement on railroad carriers to comply with arbitral awards, an action to enforce an arbitral award arose under the RLA); <u>Ry. Employees' v. Hanson</u>, 351 U.S. 225, 238 (1956)(the RLA's provision permitting CBAs to include union shop agreements was valid); <u>Virginia Ry.</u>, 300 U.S. at 548 (concluding that the RLA required the railroad carrier to recognize the duly authorized representative of its shop workers and to exert every reasonable effort to make and maintain agreements with the union).

[47] 49 U.S.C. § 11341(a).

obligations under a CBA. This conclusion is necessarily unique to the statutory exemption in the ICA. As the Supreme Court noted, Congress deemed the consolidation of railroad carriers to be important to promote the health and efficiency of the railroad industry. As such, the ICA gave the Commission the exclusive authority to examine, condition, and approve consolidations, consistent with the public interest. In conjunction with establishing the Commission's role in overseeing consolidations, carriers participating in an approved consolidation were deemed exempt from anti-trust and "all other law" necessary to let the carrier carry out the transaction. The Court noted that "[o]ur determination that [the statutory exemption] supersedes collective-bargaining obligations via the RLA as necessary to carry out an approved transaction makes sense of the consolidation provisions of the [ICA], which were designed to promote economy and efficiency in interstate transportation by the removal of the burdens of excessive expenditure."[48] Further, the ICA required the Commission, when approving a consolidation, to impose labor-protective conditions on the transaction to protect employees' interests as much as possible. With these interests protected to the extent possible, the statutory language guaranteed that:

> obligations imposed by laws such as the RLA will not prevent the efficiencies of consolidation from being achieved. If [the statutory exemption] did not apply to bargaining agreements enforceable under the RLA, rail carrier consolidations would be difficult, if not impossible, to achieve.[49]

_Id._ Thus, the Court necessarily limited its holding to the unique statutory scheme in the ICA that promotes the consolidation of railroad carriers. This decision does not stand for the general proposition that the RLA provides employees the substantive rights that employees may seek to protect through a grievance or arbitration. While the RLA imposes the obligation to make and maintain CBAs, it does not guide the substantive interpretation or application of the CBAs. Indeed,

---

[48] 499 U.S. at 132-133.

[49] 499 U.S. at 133.

the Court implicitly recognized this by holding that the collective bargaining rights were "*enforceable under* the RLA." *Id.* If it had meant otherwise, it would have said that collective bargaining rights were "*created by* the RLA."

In fact, the Supreme Court subsequently recognized in American Airlines v. Wolens, 513 U.S. 219 (1995), that the interpretation of "any other law" in Norfolk & Western was limited by the text and purpose of the provision of the ICA at issue in that case. The Wolens case involved the preemption provision of the Airline Deregulation Act, 49 U.S.C. § 1305(a)(1), which provided that "[n]o state shall enact or enforce any law, rule, regulation, standard or other provision having the force and effect of law relating to rates, routes or services of any air carrier." The Court held that this provision did not preempt a state court action to enforce frequent flyer mile contracts, concluding the terms and conditions in such a contract "are privately ordered obligations" and that "[a] remedy confined to a contract's terms simply holds parties to their agreements," and therefore an action to enforce such a contract should not be regarded as a requirement imposed under state law. In so doing, the court rejected the notion that the interpretation of the word "law" in Norfolk & Western applied broadly to the use of that term in other statutes.

In this case, unlike Norfolk & Western, in which the clear national policy of promoting railroad consolidations informed the interpretation of the statute, there is no similar statutory policy behind FRSA. Indeed, the policy underlying the whistleblower protections in FRSA is to provide "essential protection for the rights of railroad employees[.]"[50] That policy would be undermined if an employee had to forego rights guaranteed to him in his CBA when he seeks protection under FRSA based on his belief that he was retaliated against for whistleblowing activities. With the 2007 amendment to FRSA, Congress expanded the activities that are protected, provided greater remedies,

---

[50] H.R. Rep. No. 96-1025 (1980), 1980 WL 13014, at *8.

and established a new forum to adjudicate an employee's whistleblower retaliation claim. Nothing in FRSA indicates that Congress intended to foreclose the alternative remedies already available to employees. If anything, as noted above, its enactment of subsection (h) shows a contrary intent.

## IV. This Suit Does Not Pertain to the "Same Allegedly Unlawful Act of the Railroad Carrier" That Was at Issue in His CBA Appeal.

Even if "another provision of law" encompassed a grievance and/or arbitration to enforce rights guaranteed in a CBA, § 20109(f) does not preclude a FRSA claim when an employee has already pursued a grievance or arbitration because a FRSA claim does not arise out of the same "allegedly unlawful act" as the grievance and/or arbitration. The "allegedly unlawful act" for which an employee seeks protection under FRSA is the retaliation. FRSA makes it unlawful to "discharge, demote, suspend, reprimand, or in any other way discriminate against an employee" for engaging in the specific activities protected by the act.[51] An adverse action such as a discharge or discipline, however, is not in and of itself unlawful under the FRSA. It is only unlawful when it is based, in whole or in part, on the employee engaging in protected activity. In contrast, the act for which an employee seeks protection through the grievance and/or arbitration process is for a violation of the CBA. An adverse action may violate the terms of the CBA even if it was not in retaliation for whistleblowing activities. Presumably, the reverse is also true -- an adverse action may be in retaliation for whistleblowing activities, even if it is consistent with the terms of the CBA (i.e. discipline was warranted because the employee did, in fact, break a rule, regardless of the fact that the discipline was motivated, in part, by retaliation). Thus, retaliation and a violation of the CBA are not the same unlawful acts. Indeed, an employee cannot seek protection through the grievance and/or arbitration process for retaliation. The RLA now establishes that the jurisdiction of the Adjustment

---

[51] 49 U.S.C. § 20109(a).

Board (*i.e.* the NRAB and/or the PLA) is limited to interpreting and applying CBAs, and a retaliation claim does not require the application or interpretation of a CBA.[52] Consequently, even where a dispute under the CBA and a FRSA claim might address the same facts, the Adjustment Board no longer has authority to address an employee's claim of retaliation.[53]

Furthermore, as noted earlier, the Adjustment Board reviews only the on-property hearing record in determining whether the railroad violated the CBA when it disciplined the employee. Information regarding retaliation is not necessarily developed in the on-property hearing. In any event, the only question the grievance and arbitration process addresses is whether the employee in fact broke a work rule. Therefore, utilizing the grievance and/or arbitration process is not an election to seek protection for the unlawful act of retaliation. In other words, the Adjustment Board is strictly limited to deciding if a railroad's imposition of discipline was done pursuant to and consistent with the terms of the CBA contract; it cannot and does not address whether a railroad retaliated against an employee for engaging in FRSA protected whistleblower activities.

This dichotomy has been proven to be true under the specific facts of this case. It is undisputed that Plaintiff's appeal of his dismissal was not based on his whistleblowing conduct. To the contrary, NS's own exhibit shows that Plaintiff's union based his appeal on the fact that there was not a fair and impartial hearing, that the charges was not precise, that NS failed to meet its burden of proof that Plaintiff did not timely report an injury, and that the hearing officer was biased. (NXA-4) Indeed, NS's response recognized this:

---

[52] <u>Hawaiian Airlines</u>, 512 U.S. at 257-259, 262-266 (the rights provided under a state statutory whistleblower retaliation law and state tort common law of wrongful discharge were independent of the CBA; the Supreme Court concluded that the state law claims were independent of the CBA because these claims turned on purely factual questions of the employee's conduct and the employer's motive and did not require interpretation or application of any terms of a CBA).

[53] <u>Norman v. Mo. Pac.</u>, 414 F.2d 73, 82 (8th Cir. 1969)(the RLA is not set up to remedy racial discrimination in employment practices, and therefore a racial discrimination claim under Title VII is not preempted by the RLA; the RLA "is not basically a fair employment practice act").

-27-

[W]e note that much of the appeal is devoted to presenting unsupported contentions that [Plaintiff] was denied contractual due process because, supposedly the "charge was not precise" and the Hearing Officer "allowed introduction of irrelevant evidence, hearsay evidence, asked blatantly leading questions, overruled the Organization's valid objections, and attempted to influence the Carrier's witnesses to respond accordingly." ... [T]he assertion that the investigation was held in violation of Federal Law was just one more baseless attempt to distract attention from the facts of the [Plaintiff's] guilt.

(NXA-5/pp.1-3)

## V.    Subsection (f) Was Never Intended to Apply to CBA Proceedings.

The legislative history of what is now known as § 20109(f) shows that it was not intended to prevent employees from exercising the contractual remedies in their CBA. Instead, it shows that Congress was concerned that some rail workers potentially qualified for protection from discrimination under two statutes, the FRSA and OSHA. Specifically, § 11(c) of OSHA Act protects employees against retaliation for filing a complaint, instituting a proceeding, testifying, or exercising rights provided by the statute,[54] and an OSHA regulation, 29 C.F.R. § 1977.12, granted covered workers the right to be "protected against subsequent discrimination" for refusing to work under hazardous conditions.[55] Section 20109(f) is simply a reflection of Congress's intention to bar rail employees from seeking a remedy under both the FRSA arbitration remedy and the OSHA Act.[56] The House Representative who managed the 1980 bill, which included the election of remedies provision, stated:

We also agreed to a provision clarifying the relationship between the remedy provided here and a possible separate remedy under [OSHA]. Certain railroad employees, such as employees working in shops, could qualify for both the new remedy provided in this legislation, or an existing remedy under [OSHA]. It is our intention that pursuit of one remedy should bar the other, so as to avoid resort to two

---

[54] 29 U.S.C. § 660(c).

[55] 29 C.F.R. § 1977.12(b)(2).

[56] To be clear, the OSHA Act remedy Congress was concerned about in 1980 is completely different and separate from the FRSA remedy that the OSHA Administration is now involved in administrating.

separate remedies, which would only result in unneeded litigation and inconsistent results.[57]

Even NS recognizes that Congress's intent in drafting subsection (f) was to allow railroad employees to choose between a remedy under the FRSA or under OSHA and not to prevent employees from exercising their rights under their CBAs. (NS Brief, Doc.17/p.6)

Finally, NS's argument that § 20109(f) was designed to prevent employees who appeal a dismissal pursuant to a CBA from pursuing FRSA retaliation claims ignores that prior to the 2007 amendments that retaliation proceedings took place before an RLA § 3 arbitration board. In other words, retaliation claims and appeals of dismissals were pursued in one action under the CBA. Therefore, Congress must have been referring to something other than CBA proceedings when it enacted § 20109(f). Otherwise, it would have prohibited the only way that retaliation claims could have been pursued.

## VI.    This Court Should Follow the Decision of the OSHA Administrative Review Board.

"An employee who alleges discharge, discipline, or other discrimination in violation of [the FRSA anti-retaliation provisions must first] seek relief in accordance with the provisions of this section, with any petition or other request for relief under this section to be initiated by filing a complaint with the Secretary of Labor."[58] "While plaintiffs are required to first lodge a complaint with an OSHA Regional Director, the FRSA permits a plaintiff to bring an action in federal district court if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee.[59] However, the plaintiff can choose to pursue his/her claim in the Department of Labor's administrative courts. If so, the plaintiff

---

[57] 126 Cong. Rec. 26532 (1980).
[58] 49 U.S.C. § 20109(d)(1).
[59] 49 U.S.C. § 20109(d)(3).

may wait for the decision of the Regional Director, and either party can object to the Regional Director's decision and demand a trial *de novo* before an administrative law judge ("ALJ").[60] Similarly, either party can seek review of the decision of the ALJ by filing a petition with the Department of Labor's Administrative Review Board ("ARB").[61] *In re* Mercier, Case Nos. 09-121, 09-101, 2011 WL 4915758 (D.O.L. A.R.B. 2011), the ARB consolidated two decisions from two different ALJs that were on review. In the first case, the ALJ concluded that Mr. Mercier's appeal of his dismissal under his CBA did not bar his claim under § 20109(f). In the second case, the ALJ held that Mr. Koger's identical conduct did bar his claim under § 20109(f).

On review the ARB held that "the plain meaning of 'another provision of law' does not encompass grievances filed pursuant to a [CBA], which is not "another provision of law" but is instead a contractual agreement." The ARB explained:

> This understanding is illuminated by language used in Section 20109(h), which expressly references "a collective bargaining agreement" in describing the application of subsection (h). The fact that a party relies on the law to enforce a right in a collective bargaining agreement is not the same as a right created under a provision of law.[62] Consequently, if the parties' election of remedies defense rests on rights created by a collective bargaining, we do not need to interpret the remainder of the Election of Remedies provision. Nonetheless, further reasoning supports this interpretation of the statute.
>
> First, the amendment to Section 20109, which added subsections (g) and (h) does not change the interpretation of subsection (f) in this case. A grievance and arbitration action provided for in a collective bargaining agreement and enforceable under the RLA does not work to waive the rights and remedies the FRSA affords here. By their terms, sections (g) and (h) anticipate and permit a concurrent whistleblower complaint and arbitration provided for in a collective bargaining agreement and enforceable under the RLA. The language of subsection (g) states that nothing in the Act "preempts or diminishes any other safeguards" against a variety of discrimination and/or retaliation employment-related actions, and subsection (h)

---

[60] 29 C.F.R. § 1982.106.

[61] 29 C.F.R. § 1982.110.

[62] At this point, the ARB cited to <u>Graf</u>, 697 F.2d at 776 for the proposition that "[n]or does the fact that an activity is regulated by a federal statute, as collective bargaining in the railroad industry is regulated by the Railway Labor Act, mean that disputes between private parties engaged in that activity arise under the statute."

ensures that workers retain certain rights to use grievance procedures for such actions. At a minimum, the addition of subsections (g) and (h) to Section 20109 reflect Congress's apparent intent to eliminate any preemption or bar of retaliation claims when there is a concurrent grievance procedure pending under a collective bargaining agreement emanating from the same "unlawful act."[63] Thus, Mercier's collective bargaining grievance does not preclude his whistleblower complaint under the plain meaning of Section 20109(f).

Next, interpreting Section 20109(f)'s reference to "another provision of law" to not encompass grievance procedures under a collective bargaining agreement is underscored in Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974), in which the Supreme Court addressed the relationship between a grievance process for collective bargaining agreements and the enforcement of an individual's right to equal employment opportunities under [Title VII]. The Court determined that contractual rights are distinct from federal statutory rights, and held that a "contractual right to submit a claim to arbitration is not displaced simply because Congress also has provided a statutory right against discrimination." The Court held further that:

> [b]oth rights have legally independent origins and are equally available to the aggrieved employee. This point becomes apparent through consideration of the role of the arbitrator in the system of industrial self-government.... [T]he arbitrator's task is to effectuate the intent of the parties. His source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement in accordance with the "industrial common law of the shop" and the various needs and desires of the parties. The arbitrator, however, has no general authority to invoke public laws ... .[64]

This interpretation of 49 U.S.C. § 20109(f) to permit whistleblower claims to proceed concurrent with collective bargaining grievance procedures, in light of subsections (g) and (h), is consistent with the Act's plain meaning and comports with the Supreme Court's tenet that "a statute is to be considered in all its parts when construing any one of them." Like Title VII in Alexander, the 2007 Amendments to the FRSA incorporating Section 20109(g) and (h), reflect Congress's intent that railroad employees not be limited in pursuing their rights under the whistleblower statute despite also enforcing their contractual rights in arbitration.

(citations omitted).

---

[63] At this point, the ARB cited to Gonero v. Union Pacific, 2009 WL 3378987, *2-*6 (E.D. Cal. 2009), which held that the FRSA's election of remedies provision allowed railroad employee to pursue multiple claims related to railroad safety or whistleblower retaliation, including under state law.

[64] At this point, the ARB cited to McDonald v. City of West Branch, 466 U.S. 284, 288-289 (1984), which held that arbitration did not foreclose separate complaint brought under 42 U.S.C. § 1983), and Barrentine v. Arkansas-Best, 450 U.S. 728, 737-738 (1981), which held that an arbitration award did not preclude a subsequent suit based on the same underlying facts alleging a violation of the minimum wage provision of the Fair Labor Standards Act.

This opinion is well-reasoned and follows the rules of statutory construction. Although it is not binding on this Court, this Court should follow it because it is very persuasive, and the ARB is charged by statute with the task of reviewing FRSA retaliation claims that employees decide to prosecute in the Department of Labor's administrative courts. In other words, it is a specialty court, with extensive knowledge of how the Labor regulations operate as a whole. The ARB decided another consolidated appeal in the same way.[65] Indeed, the Regional Director that decided this case at the administrative stage rejected NS's reliance on § 20109(f) based on these decisions. (PX01/p.8)

NS obviously dislikes the Mercier decision. Indeed, it filed an action in district court to overturn it. In Norfolk S. Ry. v. Solis, 2013 WL 39226 (D. D.C. 2013), the district court declined to overturn Mercier, holding that it did not have jurisdiction to do so because it was an interlocutory order. Interestingly enough, in holding that the ARB was well within its power to decide as it did, the district court rejected NS's contention that subsection (f) allegedly "imposes a clear and mandatory obligation on the part of the Secretary to bar complaints from employees who have engaged in mandatory arbitration pursuant to the procedures in RLA § 3":

> Contrary to NSR's assertions, the statute is neither specific nor unambiguous. As noted above, at the forefront of the ARB decision was the question of whether an employee who engages in mandatory arbitration for violation of the terms of a CBA who also files a FRSA complaint is "seek[ing] protection" under FRSA and "another provision of law." The ARB decision, citing Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), explained that "another provision of law" does not encompass grievance procedures pursued under a CBA. In Alexander, the Court considered "under what circumstances, if any, an employee's statutory right to a trial de novo under Title VII may be foreclosed by prior submission of his claim to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." The Court determined that contractual rights under a CBA were distinct from federal statutory rights, and the rights had "legally independent origins." Referencing Alexander, the ARB decision determined that a reading of 20109(f) allowing retaliation claims to proceed concurrent with collective bargaining grievance procedures would be consistent with the plain meaning of FRSA in light

---

[65] *In re* Milton, Case No. 11-076, 2011 WL 4915766 (D.O.L. A.R.B. 2011).

of §§ 20109(g) and (h), which reinforce employee rights (under § 20109(h)) and limit the preemption of other rights of action by an employee (under § 20109(g)).

(citations omitted). The district court went on to reject all of NS's other arguments, including the same arguments that NS now makes to this Court:

> NSR[C] argues that the ARB decision's reasoning is flawed, citing <u>Norfolk & Western Ry. v. Am. Train Dispatchers Ass'n</u>, 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) for the proposition that a railroad employee seeking relief for violation of the terms of a CBA is seeking protection under the RLA, and that a CBA falls under "all other law" as it appears in a statutory immunity provision. Contrary to NSR[C]'s position, the opinion in <u>Norfolk & Western</u> is not entirely inconsistent with that in <u>Alexander</u>, nor is it as determinative as NSR[C] maintains. <u>Norfolk & Western</u> states that the obligations of the RLA "give[ ] force to the carriers' collective bargaining agreements," and that the "RLA governs the formation, construction, and enforcement of the labor-management contracts." In the instant action, as in <u>Norfolk & Western</u>, the RLA provisions for mandatory arbitration of disputes concerning the CBA are procedural, while the substantive provisions at issue come from the CBA itself.

> NSR[C]'s argument is flawed in other respects. Section 20109(f) states that the employee cannot seek protection under FRSA and another provision of law for "the same allegedly unlawful act of the carrier." By characterizing the "act" as the dismissal, NSR[C] paints the "act" with a broad enough brush to include two very different factual scenarios with two different legal claims. In Kroger's case, the unlawful act alleged under the FRSA was a dismissal in retaliation for reporting his injury. The unlawful act alleged in his RLA § 3 arbitration was dismissal in violation of his rights under the CBA concerning his responsibility for the accident.

> The statutory history supports separating the claim of retaliation from the claim of a CBA violation. NSR[C] ignores the different statutory scheme created by the 2007 amendments to FRSA.FN7

>> FN7. For instance, NSR points to the 1980 amendments to the statute and the language of Congressman Florio to assert that allowing an employee to engage in arbitration under RLA § 3 and to pursue a FRSA complaint would produce "unneeded litigation and inconsistent results." In doing so, NSR ignores that retaliation proceedings took place before an RLA § 3 arbitration board from 1980 until 2007.

Until the 2007 amendments, retaliation claims were pursued before an RLA § 3 arbitration board; therefore, retaliation claims and complaints pursuant to an employee's CBA were pursued in one action. The 2007 amendments to the FRSA were an attempt to "enhance [ ] administrative and civil remedies for employees" and "to ensure that employees can report their concerns without the fear of possible

retaliation or discrimination from employers."[66] As a part of achieving these goals, the Secretary took over the proceedings related to retaliation claims under FRSA, separating such claims from any claims alleging violations of an employee's CBA. At the same time, Congress amended the statute with § 20109(g) and 20109(h). Under NSR[C]'s reading of the statute, an employee who was dismissed both in violation of his CBA and in retaliation for reporting an injury would be forced to choose between his claim for retaliation under FRSA and his rights under his CBA. As discussed above, Congress' provisions under §§ 20109(g) and (h) limited the preemption of other rights of action by an employee and reinforced employee rights. It would be highly inconsistent with the 2007 amendments for Congress, by transferring retaliation claims to the Secretary, to limit the ability to engage in RLA arbitration and pursue a separate retaliation claim under FRSA without further clarification.

(citations omitted). Again, the district court's reasoning is sound and just. It is valuable persuasive authority that this Court should adopt in denying NS's motion to dismiss in this case.

## VII.    This Court Should Follow the Department of Labor's Interpretation of the Statute.

The Solicitor for the Labor Department filed an *amicus curiae* brief in the Mercier/Kroger litigation for the Assistant Secretary of Labor for OSHA. The Solicitor argued that the plaintiff's interpretation of the FRSA was correct and that NS's interpretation was incorrect:

Neither an employee's grievance nor an employee's initiation of arbitration constitutes an election of remedies under this provision because the substantive rights an employee is seeking to protect when he pursues a grievance and/or arbitration are provided by the CBA, not the RLA, and the action is therefore governed by contract law, which is not "another provision of law." While the RLA, which is "another provision of law," requires that railroad carriers and employees exert every reasonable effort to make and maintain CBAs and mandates how CBA disputes are to be resolved, it does not confer any substantive contractual rights or dictate the terms of the CBA or how the CBA should be interpreted or applied. As such, an employee is not seeking protection under the RLA when he claims that the railroad carrier violated the terms of his CBA when it disciplined or discharged him. Additionally, the "allegedly unlawful act" for which the employee seeks protection through a grievance and/or arbitration is not the same "allegedly unlawful act" for which the employee seeks protection under FRSA. Therefore, FRSA's election of remedies provision does not preclude a FRSA claim when an employee has pursued a grievance and/or arbitration.

---

[66] At this point, the Court cited to H.R.Rep. No. 110-259 at 348 (2007).

(PX2/pp.6-7) After setting forth over twenty pages of rationale consistent with Plaintiff's argument above, the Solicitor argued that "the Assistant Secretary respectfully requests that this Board interpret the election of remedies provision in FRSA as not precluding a FRSA claim when an employee has previously filed a grievance and/or arbitration alleging a violation of the applicable CBA." (PX2/p.26)

Plaintiff respectfully requests that this Court adopt the Solicitor's reasoning. The Sixth Circuit has laid out the following process by which federal courts should review a federal agency's interpretation of a statute:

> The initial question under step one of the Chevron framework is whether Congress has directly spoken to the precise question at issue by employing precise, unambiguous statutory language. If the text of the statute is unambiguous and, therefore, the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, [it has been] determine[d] that Congress has not directly addressed the precise question at issue, that is, that the statute is silent or ambiguous on the specific issue, [the court] must determine whether the agency's answer is based on a permissible construction of the statute.[67]

Here, the intent of Congress is clear that it never intended for a railroad employee's FRSA retaliation action to be barred merely because he appealed his dismissal through procedures set-forth under his/her CBA for the reasons set-forth above. While NS has argued that its construction allegedly follows the plain language of the statute, the only way to even follow NS's construction of § 20109(f) would require this Court to initially hold that the phrases "seek protection," "another provision of law," and "the same allegedly unlawful act of the railroad carrier" are ambiguous. "Language is ambiguous when to give the phrase meaning requires a specific factual scenario that can give rise to two or more different meanings of the phrase."[68] If the Court believes that the statute is ambiguous

---

[67] Watson v. Solis, 693 F.3d 620, 624 (6th Cir. 2012).

[68] Alliance for Cmty. v. FCC, 529 F.3d 763, 777 (6th Cir. 2008).

as to the specific issue before the Court (which would be a reasonable conclusion given the number of pages devoted to the subject), it should "move on to determine whether the Department of Labor's interpretation of the Act is permissible."[69] "[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' [if] those interpretations have the 'power to persuade.'"[70] "The weight [a court] give[s] the Department of Labor's interpretation 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade ... .'"[71] Here, the Department of Labor's *amicus* brief sets-forth twenty-six (26) pages of rationale. Therefore, it should be given respect by the courts.

## VIII. NS Would Not Be Subject to Conflicting Decisions or Obligations.

NS contends that the ARB's and Solicitor's construction of § 20109(f) should be rejected for public policy reasons because "[i]f the FRSA decisionmaker and the RLA arbitrator were to reach different results, the consequence would be that the railroad would become subject to conflicting decisions and conflicting obligations, which would defeat the purpose that §20109(f) was meant to achieve." (NS Brief, Doc.17/p.22) While it is true that "[the doctrine of election of remedies is designed to prevent vexatious litigation and harassment of defendant by dual or multiple actions for causes arising out of the same subject matter," "[t]he purpose of the doctrine is not to prevent recourse to alternate remedies, but to prevent double recovery or redress for a single wrong."[72] "Thus, the doctrine is inapplicable where no threat of double recovery exists." *Id.* Here, there is no threat of a double recovery. The ARB in Mercier squarely held that "[w]hile subsection (f) cannot be read

---

[69] Watson v. Solis, 693 F.3d 620, 624 (6th Cir. 2012).

[70] Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000).

[71] Watson v. Solis, 693 F.3d 620, 624 (6th Cir. 2012)(*citing* Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

[72] 28A C.J.S. Election of Remedies, § 1.

-36-

to bar concurrent whistleblower and collective bargaining claims, we do understand the necessity for barring duplicative recovery under those claims."[73] In other words, if an employee were to ever be awarded back pay in a CBA proceeding, he could not again recover backpay in his FRSA action.

Moreover, it should be noted that NS's concern about being subject to conflicting decisions and obligations based on the facts of this case is specious. NS overlooks the fact that Plaintiff filed his FRSA retaliation complaint with OSHA several months _before_ his termination hearing ever took place. Indeed, Plaintiff amended his FRSA complaint with OSHA stating that he was terminated as retaliation _before_ his union appealed NS's termination through the provisions of his CBA. If NS were really concerned about conflicting decisions and obligations, it would have sought to stay the CBA proceedings until after Plaintiff's FRSA claim was finally adjudicated. The FRSA proceeding was undisputedly filed first. However, NS did not. Instead, knowing full well that Plaintiff was not entitled to _de novo_ review and that it had the upper-hand in the CBA proceedings, NS charged forward to a conclusion in the second-filed action. NS should not now be permitted to wield the decision in the second-filed action as a shield against the first. If one of the actions is required to be barred under the law, it should be the second action, not the first.

## Conclusion

For all of these reasons, NS's motion for summary judgment should be denied. If any party is entitled to summary judgment, it is the Plaintiff on grounds that the subsection (f) affirmative defense is inapplicable in this case as a matter of law.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully requests this Honorable Court to deny NS's motion to dismiss and order it to file an answer.

---

[73] _Citing_ Sears Roebuck v. Metropolitan Engravers, 245 F.2d 67, 69-70 (9th Cir. 1956)("a plaintiff may pursue an action against an identical defendant in several courts at the same time, even though inconsistent remedies are sought. But ... there can be only one recovery"); Taylor v. Burlington N.R.R., 787 F.2d 1309, 1317 (9th Cir. 1986)(same).

Respectfully submitted,

*/s/ William G. Colvin*
William G. Colvin (TN BPR No.006733)
Attorney for Plaintiff George Ratledge

*OF COUNSEL:*
WILLIAM G. COLVIN P.L.L.C.
801 Broad Street; Ste. 428
Chattanooga, Tennessee 37402
Phone: (423)267-5915
Fax:    (423)267-5915
Email: bcolvin@cavett-abbott.com

*REPRESENTING PLAINTIFF PRO HAC VICE:*
William C. Tucker Jr. Esq.
PETWAY, TUCKER & BARGANIER L.L.C.
2001 Park Place North; Ste. 510
Birmingham, Alabama 35203
Phone: (205)733-1595
Fax:    (205)581-9773
Email: wtucker@lawpc.com

## Certificate of Filing and Service

I certify that on this the 28th day of March, 2013, I electronically filed the foregoing with the clerk of Court using the CM/ECF System, which will electronically serve true and exact electronic copies on the following:

Alison B. Martin Esq. / Kevin D. Hudson Esq.
Larry L. Cash Esq. / Michael James Dumitru Esq.
MILLER & MARTIN P.L.L.C.
832 Georgia Avenue
1000 Volunteer Building
Chattanooga, Tennessee 37402
amartin@millermartin.com / khudson@millermartin.com
lcash@millermartin.com / mdumitru@millermartin.com

Jeffrey S. Berlin Esq.
SIDLEY AUSTIN L.L.P.
1501 K Street Northwest
Washington, DC 2005
jberlin@sidley.com

Angela H. Smith Esq. / Wm. R. Johnson Esq.
MOORE, INGRAM, JOHNSON & STEELE L.L.P.
326 Roswell Street

-38-

Marietta, Georgia 30060
ahsmith@mijs.com / wrj@mijs.com

Charles E. Pierce Esq.
MOORE, INGRAM, JOHNSON & STEELE L.L.P.
408 Cedar Bluff Road; Ste. 500
Knoxville, Tennessee 37923
cepierce@mjis.com

*/s/ William G. Colvin*
William G. Colvin (TN BPR No.006733)


## Addendum: List of Evidentiary Exhibits

*Exhibits Filed with NS's Motion to Dismiss (Doc.16)*

| | | |
|---|---|---|
| Ex.A | = Declaration of Edward N. Jacobs Jr. | (NXA/p.__) |
| Ex.A-1 | = NS Charge Letter | (NXA-1/p.__) |
| Ex.A-2 | = NS Letter Rescheduling Hearing | (NXA-2/p.__) |
| Ex.A-3 | = NS Dismissal Letter | (NXA-3/p.__) |
| Ex.A-4 | = Union Appeal | (NXA-4/p.__) |
| Ex.A-5 | = NS's Denial | (NXA-5/p.__) |
| Ex.A-6 | = Public Law Board Decision | (NXA-6/p.__) |

*Exhibits Filed with Plaintiff's (This) Response*

| | | | |
|---|---|---|---|
| Ex.1 | = | OSHA Regional Director Decision | (PX1/p.__) |
| Ex.2 | = | Department of Labor Brief in Mercier-Kroger | (PX2/p.__) |