## THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE AT CHATTANOOGA

| | |
|---|---|
| George **RATLEDGE** | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| **v.** | ) Case No.: **1:12-cv-402** |
| | ) |
| **NORFOLK SOUTHERN RY. CO.** | ) District Judge Curtis L. Collier |
| **BULL MOOSE TUBE CO.** | ) Magistrate Judge William B. Carter |
| | ) |
| Defendants | ) |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT BULL MOOSE TUBE COMPANY'S MOTION TO DISMISS

Comes now the Plaintiff, George Ratledge, by and through counsel, who submits the following response in opposition to the motion to dismiss filed by Defendant Bull Moose Tube Company ("BMT"). The motion should be denied. A list of exhibits is in the addendum.

Plaintiff has brought a claim against BMT for a negligently inflicted personal injury he sustained on premises of BMT's Trenton, Georgia plant. (Complaint, Doc.1/¶¶67-69) It is correct that Plaintiff filed an action against Defendants BMT and Norfolk Southern Railway Company ("NS") in Tennessee State Court, asserting some but not all of the present causes of action. The state court action did not include Plaintiff's claims against NS under § 20109(a) of the Federal Railway Safety Act ("FRSA"), which are included in Plaintiff's complaint in this Court in Counts 2 and 3. United States District Courts have exclusive jurisdiction of FRSA claims.[1] Plaintiff's claims under the FRSA were not ripe when the State Court action was filed. Plaintiff's FRSA claim became ripe about the same time the Tennessee Court took BMT's motion to dismiss under advisement. Rather than splitting his cause of action between state court and federal court, Plaintiff exercised his

---

[1] 49 U.S.C. § 20109(d)(3)(only allowing suit to be filed in "the appropriate district court of the United States").

Tennessee right to dismiss his state court case without prejudice to pursue all claims in a single proceeding before this court, which has exclusive jurisdiction of Plaintiffs FRSA claim. (PX1) Plaintiff had no other motive to dismiss the Tennessee action.

BMT's motion to dismiss is deliberately cryptic. Although it contends that this Court allegedly lacks both personal and subject matter jurisdiction (BMT Brief, Doc.22/p.1), its brief does not differentiate which arguments pertain to which jurisdictional attack. Moreover, it does not even attempt to analyze this case under the federal tests for subject matter jurisdiction and personal jurisdiction. Even more odd, its motion only relies on Tennessee statutes, which, of course, have no bearing on the federal jurisdictional tests. BMT also stated that it had filed the State Court record as "Exhibit A" (*Id.* at p.2), but no such exhibit was filed with this Court.

## I.   This Court Has Subject Matter Jurisdiction Over the Claims.

BMT's contention that this Court lacks subject matter jurisdiction is frivolous because jurisdiction is proper under 28 U.S.C. § 1332. Indeed, BMT states in its answer that it "admits that Plaintiff is claiming damages in excess of $75,000 and that there is a complete diversity of citizenship." (BMT Answer, Doc.24/¶4) BMT's contention that there is no federal question jurisdiction because Plaintiff cannot establish an FELA action against it (BMT Brief, Doc.23/p.3) is a red herring. Plaintiff has asserted no FELA action against BMT. He asserts a common law negligence claim, and this Court unquestionably has diversity jurisdiction over this claim.

## II.   This Court Has Personal Jurisdiction Over BMT.

BMT's contention that this Court lacks personal jurisdiction is also without merit. To exercise personal jurisdiction in a diversity case, a district court (1) must have authorization under the state's long-arm statute and (2) the exercise of jurisdiction must not run afoul of constitutional due process

protections.[2] Because "Tennessee's long-arm statute has been interpreted to be coterminous with the limits on personal jurisdiction imposed by the Due Process Clause of the United States Constitution, [which means that] the jurisdictional limits of Tennessee law and of federal constitutional law of due process are identical,"[3] this Court only needs to assess whether specific personal jurisdiction asserted under these facts comports with constitutional due process.

### A. BMT Has Minimum Contacts With Tennessee.

"Due process requires that a defendant have "minimum contacts ... with the forum State ... such that he should reasonably anticipate being haled into court there."[4] "The presence of such contacts ensures that the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice." _Id._ "There are two forms of personal jurisdiction: general and specific." _Id._ Here, Plaintiff has established that BMT had minimum contacts with Tennessee under both forms.

### 1. Specific Jurisdiction.

"Specific jurisdiction depends on an affiliatio[n] between the forum and the underlying controversy."[5] The Sixth Circuit applies a three part test for specific jurisdiction: (1) "the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state"; (2) "the cause of action must arise from the defendant's activities there"; and (3) "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable."[6]

---

[2] Calphalon Corp. v. Rowlett, 228 F.3d 718, 721 (6th Cir. 2000).

[3] Intera Corp. v. Henderson, 428 P.3d 605, 615 (6th Cir. 2005).

[4] Schneider v. Hardesty, 669 F.3d 693, 701 (6th Cir. 2012).

[5] Schneider, 669 F.3d at 701.

[6] Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 450 (6th Cir. 2012).

"The plaintiff bears the burden of establishing that [personal] jurisdiction exists."[7] "[I]n the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleading but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." _Id._ This Court must "construe the facts in a light most favorable" to Plaintiff "because weighing any controverted facts is inappropriate at this stage."[8] "[D]ismissal is proper only if [Plaintiff's] facts collectively fail to state a prima facie case for jurisdiction." _Id._ Therefore, the Plaintiff's burden is "relatively slight." _Id._ Here, Plaintiff has established all three elements.

### a.      The "Purposeful Availment" Prong Is Met.

First, the purposeful availment element is met. "The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person."[9] Here, BMT's connection to Tennessee is neither random, fortuitous, nor attenuated. Nor is it a result of the unilateral activity of a third person. To the contrary, BMT purposefully availed itself of a Tennessee forum by its conduct made the basis of this suit.

A map of NS's rail operations shows that its Chattanooga facility (_i.e._ DeButts Yard), allows freight to be delivered to Huntsville and Memphis to the west; to Birmingham, Tuscaloosa, Meridian, New Orleans, Montgomery, Atlanta, Macon and Valdosta to the south; to Knoxville and Johnson City to the east; and to Louisville, Lexington, and Cincinnati to the north. (PX4) BMT has admitted in its answer that it operates a manufacturing facility in Trenton, Georgia, approximately twenty miles from downtown Chattanooga. (BMT Answer, Doc.24/¶8; _and see_ PX5) BMT has further admitted that it uses NS to transport its products from Trenton throughout the United States,

---

[7] Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir. 1991).

[8] Carrier Corp., 673 F.3d at 449.

[9] Schneider, 669 F.3d at 701.

a substantial majority of which is shipped through Tennessee. (BMT Answer, Doc.24/¶8) BMT and

NS have had an agreement dating back to 1984 that allows NS to use BMT track to ship BMT goods.

(PX6/bn.142-146)

    At the time of his injury, Plaintiff worked as a car inspector for NS. (PX2/pp.12-13) A

substantial part of his job was to go to various industries surrounding the Chattanooga metropolitan

area that NS serviced, including BMT, and inspect and/or repair railcars that were to be hauled by

NS on its line. (PX2/pp.17-18) Plaintiff explained:

> Q. Would [NS] just call you when [an industry] had a car that needed to be
> inspected?
> A. Yeah. The senior general foreman would call me or he would send
> somebody out of the shop down there to inspect the cars. It wasn't just anybody that
> wasn't real busy or something. A lot of times they would send them out of the shop
> to inspect because everybody there is qualified to do it. It's just and if they was all
> busy or something, he would have me run down there and inspect them. Or if I had
> something in Trenton and then something on down the road in Fort Payne or
> something, he would want me to go look at that.
> Q. Since you were already in the area?
> A. Yeah, yeah.

(PX2/p.28) Plaintiff testified that he went to the BMT facility in Trenton, Georgia, on a regular basis

and, at some times, as often as once a week. (PX2/pp.28,229-230) On 1/7/10 at 10:00 am, Plaintiff

was ordered by his supervisor to go to the BMT facility in Trenton at BMT's request to make sure

that BMT properly loaded its railcar to be hauled on the mainline and that there were no defects with

the car. (PX2/pp.31,35,55) While at the BMT facility, Plaintiff was injured when his head struck a

low beam at the facility:

> A. ... [My supervisor] called and wanted me to go down there to BMT and
> inspect a load of steel. So I drove down there and inspected it.
> Q. And what happened when you got down there? Just keep going.
> A. Oh, okay. It was starting to snow. And so I went in the door and turned left
> and that's when the beam caught me across the hard hat.
> Q. Okay.
> A. And so I went ahead and after it kindly rattled me a little bit, I went on
> over and inspected the load and checked it and then come back out and went down

and told [a BMT employee] that it was all right to go.
Q. Okay.
A. And then proceeded back to Chattanooga and went on back to work.
...
Q. Now, the beam struck you just above the brim of the hat; correct?
A. Yes, sir.
Q. So it was just above eye level?
A. Yes, sir.
Q. I think you said you're 6'3 and a half or so? .
A. Yes, sir, somewhere along there.

(PX2/pp.28,32,236) It is also undisputed that this was no isolated incident. Between 1/1/07 and

10/31/12, BMT requested NS employees to inspect 155 railcars at the BMT facility in Trenton.

(PX7/¶3) BMT had admitted to this in its answer filed in this case. (BMT Answer, Doc.24/¶11)

Furthermore, NS's discovery responses reflect that NS employees may have been called to the BMT

facility in Trenton as many as four times in 2011, eleven times in 2010 (the year of Plaintiff's injury),

eleven times in 2009, one time in 2008, and one time in 2007. (PX9/¶4; PX10/¶¶2-3/pp.847-848)

As noted above, Plaintiff made many of these trips.

The Sixth Circuit has held that "[j]urisdiction is proper ... where the contacts proximately

result from actions by the defendant [it]self that create a 'substantial connection' with the forum

State."[10] "In particular, where a defendant has created continuing obligations between [it]self and the

residents of the forum, he manifestly has availed himself of the privilege of conducting business

there." _Id._ The Supreme Court has further held that "with respect to interstate contractual obligations,

we have emphasized that parties who 'reach out beyond one state and create continuing relationships

and obligations with citizens of another state' are subject to regulation and sanctions in the other

State for the consequences of their activities."[11] The Sixth Circuit has said similarly held that when

a "nonresident defendant had entered into a contract which contemplated a continuous business

---

[10] Air Products v. Safetech Int'l, 503 F.3d 544, 551 (6th Cir. 2007).
[11] Burger King v. Rudzewicz, 105 S.Ct. 2174, 2182 (1985).

relationship with the Tennessee plaintiff, [Tennessee] has a continuing interest in this continuing relationship" and can exercise personal jurisdiction over that defendant.[12] The Sixth Circuit also held that "purposeful availment may exist when a defendant makes telephone calls and sends facsimiles into the forum state and such communications form the bases for the action."[13] It has held that this is especially so when the calls "were initiated by [d]efendants themselves and, therefore, are not simply the result of unilateral activity on the part of [the plaintiff]."[14]

In Schneider v. Hardesty, 669 F.3d 693 (6th Cir. 2012), the defendant sent letters with fraudulent statements to Ohio investors with which he was already doing business. These letters caused the Ohio investors to be harmed by a Ponzi scheme. The Sixth Circuit held that "[t]hese representations, indicative of an intent to establish an ongoing contact, are exactly the kind of conduct recognized to constitute purposeful availment for due-process purposes" in Ohio courts. The Sixth Circuit also held that "[t]his not an instance where letters a defendant drafted reached an out-of-state plaintiff by 'fortuitous' misfortune or 'attenuated' circumstances."

The Sixth Circuit also found personal jurisdiction over a Kansas defendant in a Michigan court in Air Products v. Safetech Int'l, 503 F.3d 544, 551 (6th Cir. 2007) where the Kansas defendant "had a business relationship with [the Michigan plaintiff] lasting almost nine years in which they purchased goods cumulatively worth hundreds of thousands of dollars." The Court held that "[w]ith respect to interstate contractual obligations, the Supreme Court has emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions for the consequences of their activities."

---

[12] Pickens v. Hess, 573 F.2d 380, 385 (6th Cir. 1978).

[13] Schneider, 669 F.3d at 701; see also Air Products, 503 F.3d at 552; Intera Corp., 428 F.3d at 616; Neal v. Janssen, 270 F.3d 328, 332 (6th Cir. 2001); In-Flight Devices v. Van Dusen, 466 F.2d 220, 226-227 (6th Cir. 1972); Cole v. Mileti, 133 F.3d 433, 436 (6th Cir. 1998); LAK Inc. v. Deer Creek, 885 F.2d 1293, 1300 (6th Cir. 1989); Tharo Sys. v. Cab Produkttechnik, 196 Fed. Appx. 366, 370 (6th Cir. 2006).

[14] Air Products, 503 F.3d at 552.

The case at bar presents an even stronger case for personal jurisdiction. Here, the evidence is clear that BMT had been doing business with Norfolk's facility in Chattanooga for many years. On the day of the injury, BMT called Norfolk's DeButts Yard and requested that one of its inspectors come by to inspect a loaded car. This was not an isolated request. To the contrary, it was part and parcel of their business operations. The fact that BMT invited Plaintiff from Tennessee to come onto its property in Georgia is not only the source of its duty of care, the invitation is the crux of Plaintiff's negligence action against BMT. The substantive law that applies to Plaintiff's claims against BMT provides that "[w]here an owner or occupier of land, by express or implied invitation, *induces or leads* others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe."[15] That is precisely what happened here.

### b. The "Connection" Prong Is Met.

Second, Plaintiff's negligence personal injury action arose from BMT's activities in Tennessee. The Sixth Circuit has "articulated the standard for this prong in a number of different ways, such as whether the causes of action were 'made possible by' or 'lie in the wake of' the defendant's contacts, or whether the causes of action are 'related to' or 'connected with' the defendant's contacts with the forum state."[16] In any event, this second prong is a "lenient standard,"[17] and the Sixth Circuit has explained that "the cause of action need not 'formally' arise from defendant's contacts."[18] In Air Products, the Sixth Circuit reversed a district court's finding that a fraudulent transfer action was not "made possible by" the Kansas defendant's contacts in Michigan

---

[15] Ga. Code § 51-3-1.

[16] Air Products, 503 F.3d at 553 (*citing* Youn v. Track Inc., 324 F.3d 409, 419 (6th Cir. 2003); Third Nat'l v. WEDGE Group, 882 F.2d 1087, 1091 n.2 (6th Cir. 1989)).

[17] Schneider, 669 F.3d at 703.

[18] Air Products, 503 F.3d at 553 (*citing* Bird v. Parsons, 289 F.3d 865, 875 (6th Cir. 2002)).

where the creditor resided because the transfer of assets occurred wholly outside of Michigan and did not involve entities in Michigan because "if [the Kansas d]efendants had not engaged in a long-term business relationship with [the Michigan plaintiff], they would not have accrued the debt or had a judgment entered against them, and [the Michigan plaintiff] could have no claim for fraudulent transfer."[19] In other words, because "[o]ne element of [the plaintiff's] cause of action for fraudulent transfer is that there be a debtor-creditor relationship which, as just explained, was made possible by and would not have existed but for [the Kansas d]efendants' business relationship with [the Michigan plaintiff]" and "to the extent that [the Kansas d]efendants' asset transfer was an act directed at [the Michigan plaintiff] and done with an intent to injure [the Michigan plaintiff]," that the defendant's Michigan contacts "enhanced" the causes of action in this case and "are directly related to that act." *Id.*

Again, this case is an even stronger case of jurisdiction. Were it not for the proximity to DeButts Yard and BMT's past and present business relationship with NS, Plaintiff would never has been on the Trenton property. Here, the dispute arises from BMT's request that NS send an employee to inspect a rail car on its premises. Plaintiff's claims were certainly "made possible by" and/or "lay in the wake of" BMT's Tennessee contacts. They were also "related to" and/or "connected with" those contacts.

### c.    The "Reasonableness" Prong Is Met.

Third, it is reasonable for Tennessee courts to exercise jurisdiction over BMT because both the acts of BMT and the consequences caused by its conduct have a substantial enough connection with Tennessee. "Where ... the first two criteria are met, an inference of reasonableness arises and

---

[19] 503 F.3d at 551.

only the unusual case will not meet the substantial connection criterion."[20] "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[21] Simply put, "once the first two questions have been answered affirmatively, resolution of the third involves merely ferreting out the unusual cases where that interest cannot be found."[22] "In determining whether the exercise of jurisdiction is reasonable, the court should consider, among others, the following factors: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." _Id._

In Schneider, the Sixth Circuit analyzed this factor in favor of jurisdiction over a Utah corporation that caused injury and damage in Ohio:

> While defending this matter in Ohio imposes a burden on [the defendant], we cannot conclude that this burden creates an 'unusual case' where the 'inference of reasonableness' should be abandoned. Moreover, Ohio has an interest in ensuring that its residents have adequate recourse for harms inflicted by nonresidents, and requiring [the plaintiff] to litigate this dispute in Utah would impose a substantial burden on him. "Because there is an inference of reasonableness when the first two ... prongs are satisfied, and because there are no considerations put forward by [the defendant] to overcome or contradict that inference, the exercise of jurisdiction is reasonable under the circumstances of this case."[23]

The Air Products Court also made the same finding in a case concerning a Utah defendant and a Michigan forum.[24]

This case presents an even more reasonable exercise of jurisdiction. It is not burdensome for BMT to litigate twenty miles away from its Trenton facility. Tennessee has a great interest in this

---

[20] Schneider, 669 F.3d at 703-704.

[21] Air Products, 503 F.3d at 554.

[22] S. Mach. Co. v. Mohasco Indus., 401 F.2d 374, 384 (6th Cir. 1968).

[23] 669 F.3d at 703-704 (citations omitted).

[24] 503 F.3d at 555.

dispute as it concerns not only an employment relationship centered in Chattanooga and a Tennessee plaintiff, but also a business relationship between NS and BMT centered in great measure in Chattanooga as well. Plaintiff should not be forced to divide his action in two forums. Judicial economy would be better served by a single action in this Court.

For all of these reasons, this Court has specific personal jurisdiction to adjudicate the claims against BMT.

### 2. General Jurisdiction.

This Court also has general personal jurisdiction over BMT. General jurisdiction is proper where "a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state."[25] "General jurisdiction is found where contacts are so continuous and systematic as to render [a foreign defendant] essentially at home in the forum State."[26] In assessing contacts with a forum, the federal courts have considered such factors as: (1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state, through advertisements, listings, etc.; and (4) the volume of business conducted in the state by the corporation.[27] Plaintiff has produced evidence that all of these factors justify a finding of general jurisdiction against BMT.

BMT had admitted in its brief that "it has contacts with Tennessee." (BMT Brief, Doc.23/p.2) Indeed, BMT's website boasts that its Trenton facility:

---

[25] Third Nat'l, 882 F.2d at 1089.

[26] Schneider, 669 F.3d at 701.

[27] Trierweiler v. Croxton & Trench, 90 F.3d 1523, 1533 (10th Cir. 1996)(citing Wright, et al., Federal Practice and Procedure, § 1069, at pp.348-355 (2nd ed. 1987)(collecting cases).

started in 1984 [and] is located just southwest of Chattanooga, Tennessee and strategically located at the hub of the southeastern market, equally close to Atlanta, Birmingham, Nashville and Knoxville. [The] Trenton [facility] was significantly expanded in 1998 for the addition of a structural mill keeping with the Bull Moose Tube philosophy of being a leader in regional tube production and being close to the customer.

(PX3) It further boasts that the Trenton facility was built because BMT "needed regional manufacturing representation in the southeastern area of the United States" and that the Trenton facility was intended to be "[s]trategically located at the hub of the southeastern market, equally close to Atlanta, Birmingham, Nashville, and Knoxville, the facility's tube mills operate 24 hours a day. (*Id.*) It further boasts that it is "one of the largest and most dominant tubing manufacturers in North America." (PX3) BMT admits in its answer filed with this Court that "the website in question speaks for itself." (BMT Answer, Doc.24/¶9)

Not only has BMT shown a general intent to dominate the Chattanooga, Nashville, and Knoxville markets, it has a website search engine that allows its Tennessee customers to locate BMT "Territory Managers" to buy products. (PX3) If "Tennessee" is selected, the customer is told that "Jackson and all points west are served by Tom Thurgood while all points east of Jackson are served by Randy Thompson." (PX3) There are phone numbers and fax numbers for Randy Thompson that has a 615 area code prefix. (PX3) It is clear that Thompson is an employee as he has a BMT email address. (PX3) Indeed, elsewhere on the website, he is referred to as a "General Sales Manager" for BMT. (PX3) BMT not only admitted in paper discovery in the Circuit Court action that Thompson in fact works and lives in Tennessee, it also admitted that it has had a sales agents in Tennessee for approximately *29 years*. (PX8/¶¶7,9) BMT also has eight Tennessee residents who work at its Trenton facility. (PX6/¶4/p.6; PX8/¶¶4,6)

An internet search reveals that the "Bull Moose Tube Company" has business addresses at (1) 3600 Hillsboro Pike, Suite G3, Nashville, Tennessee, (2) 201Gillespie Drive, Apt. 18208,

Franklin, Tennessee, and/or (3) 115 Summit Ridge Ct., Nashville, Tennessee 37215. (PX11) Some of the numbers on the search engine correspond to the phone and fax numbers on BMT's website. (PX11) These search engines also show that three people are employed at these offices and that there is an annual revenue of $68,000. (PX11) This figure is low because BMT admitted in paper discovery in the Circuit Court action that it has sold over $35,000,000.00 of product in Tennessee since January 1, 2007, with average sales of almost $6,000,000.00 per year. (PX8/¶5; PX6/¶5/pp.7-8) BMT has admitted to these numbers in its answer filed in this case. (BMT Brief, Doc.24/¶10) It has also admitted that it has sold product in, and shipped product through, Tennessee for approximately _50 years_. (PX8/¶¶8,10) Since BMT sold $35,000,000.00 in Tennessee in the last five years, it can be assumed that it sold many times that amount in the forty-five years before.

The Sixth Circuit has held that where a nonresident corporation merely maintains an office and agent in the forum state that a finding of general jurisdiction is proper.[28] For example, in <u>Mich. Natl. v. Quality Dinette</u>, 888 F.2d 462, 466 (6th Cir. 1989), the Sixth Circuit held that the exercise of general jurisdiction was proper where the defendants retained an independent sales representative in Michigan, conducted mail order solicitations of Michigan businesses, "made over 400 sales totaling over $625,000 in 1986 and 1987," and "made at least one sale in Michigan each and every month during 1986 and 1987." The facts of this case exceed those numbers substantially. Therefore, this Court can not only assert specific jurisdiction over BMT, it can also assert general jurisdiction over it.

    **3.    Neither a Physical Presence Nor Injury in Tennessee Is Required.**

BMT's contention that Tennessee courts lack personal jurisdiction because "it is not incorporated in Tennessee, is not authorized to transact business in Tennessee, does not have offices

---

[28] <u>Bird</u>, 289 F.3d at 873-874.

in Tennessee and is not a Tennessee resident" (BMT Brief, Doc.23/p.2) misses the point. The Sixth Circuit has held that a "physical presence in a forum state is not required, and the Supreme Court has consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."[29] As explained by the Supreme Court:

> Jurisdiction ... may not be avoided merely because the defendant did not physically enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.[30]

Similarly, its contention that the injury was inflicted in Georgia (BMT Brief, Doc.23/pp.1-2) is irrelevant. The Sixth Circuit has rejected a similar argument:

> [The defendant] stresses that the "activities allegedly giving rise to [the plaintiff's] claims ... occurred outside Ohio," and concludes that the "arising from" prong has not been satisfied. But [the defendant's] argument overlooks that the operative facts regarding the formation and meaning of the ... contract negotiated and executed by [the defendant] in Ohio, are substantially connected with [the defendant's] activities. Given this substantial connection, it matters not that the actual breach ... may have occurred in Germany in assessing the "arising from" prong of the due process analysis.[31]

### B.    BMT Can Be Reached under Tennessee's Long-Arm Statute.

"In a diversity case, a plaintiff must [also] satisfy the state-law requirements for personal jurisdiction."[32] It might be thought that BMT's citation to Tennessee statutes in support of its jurisdictional arguments might be an attempt to argue that it allegedly does not meet the Tennessee

---

[29] Air Products, 503 F.3d at 551.

[30] Burger King, 105 S.Ct. at 2184.

[31] Tharo Sys., 196 Fed. Appx. at 371-372.

[32] Schneider, 669 F.3d at 699.

requirements for personal jurisdiction. However, Tennessee's principal long-arm statute, Tenn. Code § 20-2-214(a)(1), (2), and (5) not only provides that "[p]ersons[33] who are nonresidents of this state and residents of this state who are outside the state and cannot be personally served with process within this state are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from ... (1) [t]he transaction of any business within this state, (2) [a]ny tortious act or omission within [Tennessee], [and] (5) [e]ntering into a contract for services to be rendered or for materials to be furnished in this state," subsection (a)(6) states that it also extends the personal jurisdiction of Tennessee courts to "[a]ny basis not inconsistent with the constitution of ... the United States." Another Tennessee statute similarly states that "[a] court may exercise personal jurisdiction over a person,[34] who acts directly or indirectly, as to a claim for relief arising from the person's: (1) [t]ransacting any business in [Tennessee]; (2) [c]ontracting to supply services or things in [Tennessee]; ... [and] (4) [c]ausing tortious injury in this state by an act or omission outside [Tennessee] of the person who regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, [Tennessee] ... ."[35] The Tennessee Supreme Court has held that the Long Arm Statute "fully extends to the bounds imposed by the due process clause of the Fourteenth Amendment of the United States Constitution."[36] Because this Court has specific and general jurisdiction over BMT under the Fourteenth Amendment tests, it does not offend Tennessee law for BMT to be subject to the power of this Court. Indeed, numerous Tennessee decisions hold that Tennessee courts can exercise

---

[33] A "person" includes "corporations and all other entities that would be subject to service of process if present in this state," and "[a]ny such person shall be deemed to have submitted to the jurisdiction of this state who acts in the manner described [above] through an agent." Tenn. Code § 20-2-214(b),(c).

[34] Again, "person" includes "a corporation, partnership, association or any other legal or commercial entity, whether or not a citizen or domiciliary of [Tennessee] and whether or not organized under the laws of [Tennessee]." Tenn. Code § 20-2-221.

[35] Tenn. Code § 20-2-223(a).

[36] Godwin Aircraft v. Houston, 851 S.W.2d 816, 821 (Tenn. Ct. App. 1992)

personal jurisdiction over BMT under the facts at issue here.[37] Therefore, BMT's reliance on Tennessee statutes are misplaced.

BMT's reliance on a third long-arm statute, Tenn. Code § 20-2-201, and the cases of Davenport v. State Farm, 756 S.W.2d 678 (1988) and Williams v. Williams, 621 S.W.2d 567 (1981) for the proposition that this Court lacks personal jurisdiction over it is without merit for three reasons. First, § 20-2-201 states that "[a]ny corporation claiming existence under the laws of ... any other state ... shall be subject to suit [in Tennessee] to the same extent that corporations of [Tennessee] ... so far as relates to [1] any transaction had, in whole or in part, within [Tennessee] or [2] any cause of action arising here, but not otherwise." (brackets inserted) Here, the transaction relates to a transaction had at least in part in Tennessee for the reasons above. Second, even if the transaction made the basis of Plaintiff's claim had not been partially conducted in Tennessee, BMT's reliance on the "but not otherwise" phrase in the statute for the proposition that § 20-2-201 allegedly trumps the other long-arm statutes is without merit. BMT's own Davenport case states that because the Legislature's later enactment of Tenn. Code § 20-2-214(a)(6), which extended the personal jurisdiction of Tennessee courts to the limits of the Fourteenth Amendment, "resulted in an irreconcilable conflict with the phrase "but not otherwise" found in § 20-2-201, that the "but not otherwise" was "repealed by implication" by § 20-2-214(a)(6).[38] Third, although BMT is correct that its Williams case held that "[a] foreign corporation doing business in Tennessee cannot be sued in Tennessee on a claim arising wholly outside Tennessee and having no connection with Tennessee,"[39] BMT fails to report that this holding was overruled by the Tennessee Supreme Court in Davenport

---

[37] Nicholstone Book v. Chelsea House, 621 S.W.2d 560 (Tenn. 1981); Masada Inv. v. Allen, 697 S.W.2d 332 (Tenn. 1985); Carloss Well v. Hammett & Sons, 1999 WL 1336046 (Tenn. Ct. App. 1999); Precision Castings v. H&H Mfg., 2012 WL 3608668 (Tenn. Ct. App. 2012).

[38] 756 S.W.2d at 685.

[39] 621 S.W.2d at 569.

because § 20-2-214(a)(6) "grants jurisdiction to the outer limits of due process over foreign corporations having no office, qualification or agent in Tennessee."[40]

BMT's reliance on Tenn. Code Ann. § 20-4-101 for the proposition that "a transitory action must be brought in the county where the action arose or in the county where the Defendant resides" (BMT Brief, Doc.23/p.4) is misplaced because § 20-4-101 is a venue statute, not a long-arm statute. Venue and personal jurisdiction, of course, are distinct concepts:

> The terms "venue" and "jurisdiction'" are closely related but are not synonymous. While jurisdiction is the power and authority of the court to act, venue is the place where the power to adjudicate is to be exercised, that is, the place where the suit may or should be heard. ... Subject matter jurisdiction and venue are distinct, but they must exist simultaneously in order for a court to properly exercise its power to resolve a controversy. Personal [jurisdiction] and subject matter jurisdiction require compliance with constitutional mandates; in contrast, venue issues are not so burdened, and the situs of an action may be located anywhere within the geographical jurisdiction of the court as deemed appropriate by applicable statute or rule. Venue does not involve a jurisdictional question but rather a procedural one, and thus is a matter that goes to process rather than substantive rights. Venue issues, unlike those involving personal [jurisdiction] and subject matter jurisdiction, do not result in the enlargement or impairment of substantive rights. Venue assumes the existence of jurisdiction.[41]

Whether venue is proper in this Court is controlled by the U.S. Code, not Tennessee procedural law. BMT makes no argument that venue is improper in this Court under the U.S. Code.

Moreover, even if Tennessee's venue statutes could possibly have any bearing on this case, BMT's construction of those statutes is incorrect because BMT's reliance on § 20-4-101 fails to consider whether venue would have been proper in Hamilton County against its co-defendant, NS. It is basic venue law that "where there are multiple defendants, the plaintiff may base venue on the residence of any one of them where the venue statute establishes a defendant's residence as an

---

[40] 756 S.W.2d at 684.

[41] 77 Am.Jur.2d Venue, § 2.

appropriate forum."[42] Tennessee law follows this rule.[43] The venue analysis under Tennessee begins by determining whether the action is "transitory" or "local." "A transitory action is one in which the injury occurred to a subject not having an immovable location; therefore a transitory action could have occurred anywhere."[44] "On the other hand, a local action is an action in which the injury occurred to an immovable object; the classic example is an action involving injury to real property." *Id.* The Tennessee Supreme Court has held that "the most apt illustration of ... a transitory action [is] an injury to the person."[45] Based on this analysis, it is clear this is a transitory action, not a local action. In the case at bar, venue of Plaintiff's transitory claims against NS is proper in Hamilton County under two Tennessee statutes.

First, Plaintiff's claims against Norfolk are proper in Hamilton County under Tennessee's general transitory venue statute, Tenn. Code § 20-4-101(a), which states that "[i]n all civil actions of a transitory nature, unless venue is otherwise expressly provided for, the action may be brought in the county ... where the defendant resides or is found." Tennessee Courts have held that corporations -- regardless of whether they are foreign or domestic -- "may be 'found' pursuant to [Tenn. Code §] 20-4-101(a) in any county wherein it has an office for the furtherance of its business activities."[46] Directly on-point and controlling is <u>Garland v. Seaboard Coast Line</u>, 658 S.W.2d 528, 531 (Tenn. 1983), where our Supreme Court held that venue of a FELA case against a railroad is

---

[42] 77 Am.Jur.2d <u>Venue</u>, § 9.

[43] <u>Comm. Truck v. McCampbell</u>, 580 S.W.2d 765, 770 (Tenn. 1979); <u>Fred's Finance v. Fred's of Dyersburg</u>, 741 S.W.2d 903 (Tenn. Ct. App. 1987); <u>Woods v. Fields</u>, 798 S.W.2d 239, 242-243 (Tenn. Ct. App. 1990); <u>Williams v. Sugar Cove</u>, 955 S.W.2d 75, 77 (Tenn. Ct. App. 1997); <u>Mills v. Wong</u>, 39 S.W.3d 188, 190 (Tenn. Ct. App. 2000); <u>Hermosa Hold. v. Mid Tenn. Bone</u>, 2009 WL 711125, *12 (Tenn. Ct. App. 2009); <u>Pack v. Ross</u>, 288 S.W.3d 870, 874 (Tenn. Ct. App. 2008); <u>Pearson v. Vencor Nursing</u>, 2004 WL 1606975 (Tenn. Ct. App. 2004); *and see* Pivnick, <u>Tennessee Circuit Court Practice</u>, § 6-2.

[44] <u>Five Star v. Davis</u>, 866 S.W.2d 944, 945 n.1 (Tenn. 1993).

[45] <u>Hall v. Southhall Bros.</u>, 240 S.W. 298, 299 (Tenn. 1922); <u>Mattix v. Swepston</u>, 155 S.W. 928, 929 (Tenn. 1913)(same); <u>Suggs v. Gallaway Health</u>, 2011 WL 1458663, n2 (Tenn. Ct. App. 2011)("a personal injury action is considered a transitory cause of action").

[46] <u>Garland</u>, 658 S.W.2d at 533-534 (citations omitted).

-18-

controlled by Tenn. Code § 20-4-101 and that such a case can be brought in any county where the railroad has an office for business. Here, it is undisputed that NS has an office for business in Hamilton County. Indeed, NS's DeButts Yard in Chattanooga is a large operation.

A second statute, Tenn. Code § 20-4-104, also provides venue for Plaintiff's claims against Norfolk in this action. It provides that "[w]hen a corporation ... has an office or agency in any county for the transaction of business, actions growing out of, or connected with, the business of that office or agency, may be brought in the county in which the office or agency is located." Here, Plaintiff's FELA claim against NS most definitely grows-out of Norfolk's Hamilton County office (i.e. DeButts Yard). Plaintiff reported for work in Chattanooga every day. (PX2/p.21) Moreover, he was dispatched from the Chattanooga office to BMT's facility in Trenton on the day of the incident. Based on these two statutes, venue of Plaintiff's claims against Norfolk is unquestionably proper in Hamilton County. Therefore, Plaintiff's claims against BMT are also proper there.

While the "good for one, good for all" rule does not apply when a specific venue statute "localizes" venue in a particular county,[47] no specific statute would have localized venue of this case in any other Tennessee county if it were pending in State court. The statute that most often "localizes venue" in a particular county is Tenn. Code § 20-4-101(b), an exception to the general rule of § 20-4-101(a) that states that "[i]f, however, the plaintiff and defendant both reside in the same county in this state, then the action shall be brought either in the county where the cause of action arose or in the county of their residence." Section 20-4-101(b) is known as Tennessee's "common county rule" because it "limits venue in transitory actions if 'the plaintiff and defendant both reside in the same county in this state.'"[48] While the common county rule applies "in cases involving multiple

---

[47] Mills, 39 S.W.3d at 189 (recognizing joinder rule does not apply "to a purely localized action"); Pivnick, Tennessee Circuit Court Practice, § 6-2 ("[a]n exception [good for one, good for all rule] applies as to a defendant having common county residence with the plaintiff"),

[48] Suggs, 2011 WL 1458663 at *3; Freeman v. CSX Transp., 2010 WL 4366080, at *3 (Tenn. Ct. App. 2010).

defendants if the plaintiff and at least one material defendant reside in the same county and that county is where the cause of action accrued,"[49] it does not apply in any other case:

> The statutory common county rule, however, does not apply in transitory actions involving multiple defendants where not all of the material defendants reside in the same county as the plaintiff and none of the material defendants reside in the county where the cause of action arose. This is due to the fact that "Tenn. Code [§] 20-4-101(b) does not by its terms apply to multiple parties, ...". ... [T]his is apparent from a literal reading of the statute, which reads in pertinent part: "the plaintiff and defendant both reside in the same county in this state." "Although Tenn. Code [§] 20-4-101(b) does not by its terms apply to multiple parties, our Supreme Court has applied it in cases where the plaintiff and one of several defendants reside in the same county and the cause of action arose there." Therefore, the rule does apply in cases involving multiple defendants if the plaintiff and at least one material defendant reside in the same county and that county is where the cause of action accrued.[50]

It is clear that the "common county rule" has no application in this case because even if Plaintiff had a "common county" with either Defendant, the action would have been filed in the right county. The Plaintiff resides in Soddy Daisy, which is in Hamilton County. (PX2/p.7) Thus, regardless of where Norfolk and BMT have their "residence," the "common county rule" could not localize venue in any county other than Hamilton.

For all of these reasons, Tennessee law could not prevent this Court from exercising personal jurisdiction over BMT in this case, even if it applied.

### C.    This Suit Does Not Offend Traditional Notions of Fair Play and Substantial Justice.

Finally, "[t]o comply with due process, a court's exercise of its power over an out-of-state defendant must not offend traditional notions of fair play and substantial justice."[51] the factors utilized in this analysis include: (1) the burden on the defendant; (2) the forum state's interest in

---

[49] Freeman, 2010 WL 4366080, at *4 (*citing* Tims v. Carter, 241 S.W.2d 501, 503 (Tenn.1951); Ward v. Nat'l Healthcare, 2007 WL 3446340, at *2 (Tenn. Ct. App. 2007); Winters, 836 S.W.2d at 585); *see also* Suggs, 2011 WL at n.3 (same)

[50] Freeman, 2010 WL 4366080 at *4 (citations omitted).

[51] Indah v. U.S. Sec., 661 F.3d 914, 920 (6th Cir. 2011).

adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.[52] These factors are similar to those set-forth in Section II-A-1-c above. These factors all weigh in favor of jurisdiction. It is not burdensome for BMT to litigate twenty miles away from its Trenton facility. Tennessee has a great interest in this dispute as it concerns not only an employment relationship centered in Chattanooga, but also a contractual relationship between Norfolk and BMT centered in Chattanooga as well. Plaintiff should not be forced to divide his action in two forums and the judicial system would be greater served by a single action here. Although federal courts should "recognize the need to use particular caution when extending personal jurisdiction to foreign defendants,"[53] BMT is not a foreign defendant but an American corporation that sits just outside the Tennessee border.

This result is fair and right. Plaintiff has the right to file his FELA and FRSA claims action against his employer wherever venue is proper. They are not only proper in this Court, it is unquestionably the most convenient place for that claim to proceed as the Plaintiff resides here, his employment relationship with NS is centered here, he was summoned from here to travel to the BMT facility in Trenton as part of the regular course of business between NS and BMT, and Plaintiff's doctor is here. BMT's facility is only twenty miles away. Therefore, not only is it the most convenient forum for Plaintiff and NS, it is undisputedly the most convenient forum for BMT.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully requests that this Honorable Court deny BMT's motion to dismiss.

---

[52] World Wide v. Woodson, 444 U.S. 286, 292 (1980).

[53] Carrier Corp., 673 F.3d at 451.

Respectfully submitted,

 /s/ William G. Colvin 
William G. Colvin (TN BPR No.006733)
Attorney for Plaintiff George Ratledge

OF COUNSEL:
WILLIAM G. COLVIN P.L.L.C.
801 Broad Street; Ste. 428
Chattanooga, Tennessee 37402
Phone: (423)267-5915
Fax:    (423)267-5915
Email: bcolvin@cavett-abbott.com

REPRESENTING PLAINTIFF PRO HAC VICE:
William C. Tucker Jr. Esq.
PETWAY, TUCKER & BARGANIER L.L.C.
2001 Park Place North; Ste. 510
Birmingham, Alabama 35203
Phone: (205)733-1595
Fax:    (205)581-9773
Email: wtucker@lawpc.com

**Certificate of Filing and Service**

I certify that on this the 28th day of March, 2013, I electronically filed the foregoing with the clerk of Court using the CM/ECF System, which will electronically serve true and exact electronic copies on the following:

Alison B. Martin Esq. / Kevin D. Hudson Esq.
Larry L. Cash Esq. / Michael James Dumitru Esq.
MILLER & MARTIN P.L.L.C.
832 Georgia Avenue
1000 Volunteer Building
Chattanooga, Tennessee 37402
amartin@millermartin.com / khudson@millermartin.com
lcash@millermartin.com / mdumitru@millermartin.com

Jeffrey S. Berlin Esq.
SIDLEY AUSTIN L.L.P.
1501 K Street Northwest
Washington, DC 2005
jberlin@sidley.com

Angela H. Smith Esq.
Wm. R. Johnson Esq.
MOORE, INGRAM, JOHNSON & STEELE L.L.P.

-22-

326 Roswell Street
Marietta, Georgia 30060
ahsmith@mijs.com / wrj@mijs.com

Charles E. Pierce Esq.
MOORE, INGRAM, JOHNSON & STEELE L.L.P.
408 Cedar Bluff Road; Ste. 500
Knoxville, Tennessee 37923
cepierce@mjis.com

*/s/ William G. Colvin*
William G. Colvin (TN BPR No.006733)


**Addendum**
**List of Evidentiary Exhibits Filed with Plaintiff's (This) Response**

Ex.1  = State Court Order of Voluntary Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (PX1/p._)
Ex.2  = George Ratledge Deposition Excerpts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (PX2/p._)
Ex.3  = BMT Website Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (PX3/p._)
Ex.4  = NS Track Map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (PX4/p._)
Ex.5  = Map Showing Proximity of BMT to Chattanooga . . . . . . . . . . . . . . . . . . . . . (PX5/p._)
Ex.6  = BMT's Initial Responses to Second RFP . . . . . . . . . . . . . . . . . . . . . . . . . . . (PX6/p._)
Ex.7  = BMT's Supplemental Responses to Second RFP . . . . . . . . . . . . . . . . . . . . . (PX7/p._)
Ex.8  = BMT's Answers to Second Interrogatories . . . . . . . . . . . . . . . . . . . . . . . . . . (PX8/p._)
Ex.9  = NS's Answers to Second Interrogatories . . . . . . . . . . . . . . . . . . . . . . . . . . . . (PX9/p._)
Ex.10 = NS's Responses to Third RFP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (PX10/p._)
Ex.11 = Website Search Results for BMT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (PX11/p._)