# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

GEORGE RATLEDGE,             )
                                    )
        Plaintiff,          )
                                    )      1:12-CV-402
v.                              )
                                    )      Judge Curtis L. Collier
NORFOLK SOUTHERN RAILWAY CO.    )
and BULL MOOSE TUBE CO.,          )
                                    )
        Defendants.       )

## M E M O R A N D U M

Before the Court is Defendant Norfolk Southern Railway Company's ("NSR") motion to dismiss Count Two of the complaint for lack of subject matter jurisdiction (Court File No. 16). Plaintiff George Ratledge ("Plaintiff") responded in opposition (Court File No. 33), and NSR replied to his response (Court File No. 37). Because no court had yet ruled upon the question presented by this motion, the Court allowed the parties to exceed the page limits for dispositive motions set forth in the local rules of the Eastern District of Tennessee (Court File No. 15). Additionally, the United States filed a statement of interest pursuant to 28 U.S.C. § 517 on behalf of the U.S. Department of Labor ("DOL"), which administers and enforces the relevant statutory section at issue (Court File No. 44). NSR responded to the United States' statement of interest (Court File No. 48).

Approximately one week after the parties submitted their briefs, another district court ruled on the question currently before the Court. In *Reed v. Norfolk Southern Railway Co.*, No. 12-cv-873, 2013 WL 1791694 (N.D. Ill. Apr. 26, 2013), the court denied NSR's motion for summary judgment. Plaintiff alerted the Court to this development pursuant to Local Rule 7.1(d) (Court File No. 39), and NSR responded, arguing *Reed* was wrongly decided (Court File No. 42). NSR later supplemented its response, noting the *Reed* court granted a motion to certify its opinion for

interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (Court File Nos. 43, 50).

NSR argues Plaintiff's claim under the whistleblower provision of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109, must be dismissed because that section's election-of-remedies provision precludes a rail carrier employee from simultaneously pursuing arbitration of his rights under a collective bargaining agreement and seeking whistleblower protection under the FRSA. Plaintiff, on the other hand, argues the election-of-remedies provision does not apply to statutorily mandated arbitration. The Court agrees with Plaintiff. For the following reasons, the Court will **DENY** NSR's motion to dismiss (Court File No. 16).

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following recitation of the facts underlying this action comes, as it must, from the allegations in the complaint. NSR is a common carrier engaged in shipping by rail. NSR maintains a facility in Hamilton County, Tennessee called the DeButts Yard facility. Plaintiff was employed as a "carman" by NSR at the DeButts facility between 1971 and 2010.

On January 7, 2010, Plaintiff was sent to inspect a load of steel at a Trenton, Georgia facility operated by Bull Moose Tube Company.[1] Typically employees would enter the Bull Moose facility through two large roll-up doors. On the day in question, however, the doors were closed due to cold weather. Plaintiff entered through a different door, on the side of the building. Plaintiff turned left after walking through the door and hit his head against a metal support beam. Although Plaintiff was wearing a hard hat, his head and neck were injured by the blow.

Plaintiff felt merely rattled at first and continued with his duties. By the following morning,

---

[1] Bull Moose is also a defendant in this case. However, Bull Moose was not listed in Count Two, the only count relevant to the instant motion. Bull Moose filed a motion to dismiss on jurisdictional grounds, which the Court will consider in a separate memorandum and order.

Plaintiff's condition became more serious. He informed NSR Senior General Foreman Terry Sayers about the incident and requested the proper injury forms. Sayers informed Plaintiff NSR would fire Sayers as foreman if Plaintiff filled out the injury forms. He told Plaintiff to postpone reporting the injury in order to determine whether it might improve on its own. Plaintiff obliged, feeling he might be fired himself if he disobeyed.

However, by the following Monday, January 11, 2010, Plaintiff decided he could suffer no longer and confronted Sayers again. He was told to wait once more, and if he did decide to report the injury, to change the date of the injury to the report date, rather than January 7, 2010. On the same day, Plaintiff discussed the injury with NSR General Foreman Robert Steed, who stated he would discuss the situation with Sayers. Plaintiff continued to work in spite of the pain.

By Wednesday, January 13, 2010, the pain had become too severe to ignore, complete with numbness and tingling in his right arm, and Plaintiff told Sayers he must seek medical attention. Sayers notified NSR Division Manager of Mechanical Operations Kevin Krull. Plaintiff also finally filled out the injury forms, correctly listing January 7, 2010 as the date of injury. Plaintiff was then transported to Work Force Corporate Health Services where Michael Gaither, NSR's physician, treated him. He assessed Plaintiff with (1) degenerative disc disease in the cervical spine; (2) right shoulder pain; (3) muscle spasm; and (4) head contusion-questionable concussion. Gaither prescribed Naprosyn, Flexeril, Lortab, and a Computed Tomography ("CT") scan. He released Plaintiff to work with restrictions, including no pushing, no pulling, no lifting over fifteen pounds with his right arm, no lifting with outstretched right arm, and limiting use of his right arm.

After he returned from treatment, Krull, Sayers, Steed, and other NSR employees interviewed Plaintiff about the circumstances of his injury. Krull told Plaintiff NSR could not

3

accommodate his restrictions, and he would be unable to return to work until cleared by NSR's Medical Department. The interviewers then initiated an investigation. They measured Plaintiff in full safety garb, including a hard hat and safety boots, and measured his height at 79.5 inches from the floor to the top of his hard hat.[2] They measured Plaintiff in a "slouched" position, approximating his height at the time he struck the support beam. When Krull, Sayers, and Steed visited the Bull Moose facility, they measured the distance between the floor and the support beam Plaintiff claimed to have struck. The top support beam was 74 inches from the floor, while the bottom support beam was 71.75 inches from the floor. They also noticed cobwebs on the support beam but did not find any white residue on Plaintiff's hard hat. Performing a crude experiment, they struck Krull's own hard hat against a similar beam, which resulted in some residue transference.

The cohort concluded Plaintiff could not have sustained his injury as he reported it to them during the interview. They decided to place Plaintiff "out of service" pending a formal disciplinary hearing. On January 15, 2010, Plaintiff received a charge letter with two charges: (1) failing to properly and timely report an injury in violation of "General Rule N"; and (2) falsification of an injury. The late reporting charge was dropped after Krull discovered Sayers and Steed prevented Plaintiff from timely reporting his injury.

An investigative hearing was held on September 9, 2010, during which Plaintiff submitted the findings of a retained expert, Dr. Tyler Kress. He was not, however, represented by counsel. Although Plaintiff and his retained expert were denied access to the Bull Moose facility to conduct an independent investigation, Dr. Kress concluded Plaintiff's height decreased three inches during regular stride, which resulted in the lower part of his hard hat being 71 inches from the floor. This

---

[2] Without this gear, Plaintiff is 6' 4", or 76 inches tall.

was roughly the height of the bottom support beam as measured by the investigators. Dr. Kress also noted Plaintiff may, as many do, slouch as he walks, in which case the effective height of the lower part of his hard hat would be less than 71 inches. Dr. Kress also concluded hard-hat impacts do not typically leave visible evidence due to the type of plastic used to produce them.

In spite of this report, the NSR investigation concluded Plaintiff falsified his injury. NSR terminated Plaintiff's employment on October 8, 2010. On November 30, 2010, Plaintiff's union representative appealed his dismissal to NSR's Director of Labor Relations D.L. Kerby on the grounds the investigative hearing was not fair and impartial and violated Rule 29 of the Controlling Agreement. The appeal was denied on January 28, 2011. Plaintiff then sought relief from the Public Law Board, which concurred with the guilty decision on June 21, 2011, but found a permanent dismissal unwarranted in light of Plaintiff's extensive service. The Board ordered Plaintiff be reinstated with seniority intact, but did not award him payment for lost time. Plaintiff is, however, disabled from his normal duties.

Earlier, on March 17, 2010, Plaintiff filed a complaint with the Regional Administrator of Occupational Safety & Health Administration ("OSHA") pursuant to the FRSA, 49 U.S.C. § 20109, and the DOL's implementing regulations, 29 C.F.R. Part 1982. He amended his complaint on October 13, 2010, in which he alleged NSR retaliated against him and interfered with his medical treatment. On July 18, 2012, the OSHA Regional Administrator found in Plaintiff's favor, and awarded him compensatory damages, punitive damages, attorney's fees, and other relief. On August 8, 2012, NSR objected to these findings and requested a hearing before the Office of the Administrative Law Judges of the DOL. Plaintiff notified the DOL on October 23, 2012 he intended to file suit in U.S. District Court.

5

Also, after receiving the charge letter but before the September hearing, Plaintiff filed a complaint with the U.S. Department of Transportation, Federal Railroad Administration ("FRA"). On November 29, 2010, the FRA informed Plaintiff NSR violated federal regulations when it "harassed and intimidated" him between January 7 and January 13, 2010. *See* 49 C.F.R. § 225.33.[3] The FRA further concluded NSR violated regulations when it did not allow Plaintiff to file an initial injury report, *see id.*, and when it did not document the injury on its required monthly report, *see* 49 C.F.R. § 225.11.

Plaintiff filed a personal injury suit against NSR and Bull Moose in the Circuit Court of Hamilton County on August 26, 2010, asserting some of the claims alleged in this case. He voluntarily dismissed that action without prejudice on November 27, 2012. Shortly thereafter, on December 26, 2012, Plaintiff filed the instant action. Plaintiff brings four claims: (1) negligence against NSR pursuant to 45 U.S.C. § 51; (2) retaliation by NSR in violation of the FRSA, 49 U.S.C. § 20109(a), and its implementing regulations; (3) interference with treatment against NSR in violation of the FRSA, 49 U.S.C. § 20109(c), and its implementing regulations; and (4) negligence against Bull Moose pursuant to state common law or statutory law.

NSR filed a motion to dismiss Count Two for lack of subject matter jurisdiction, based on the election of remedies clause in the FRSA, 49 U.S.C. § 20109(f), which provides "[a]n employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier." Plaintiff responded in opposition. Additionally, the United

---

[3] Plaintiff lists more specific paragraphs in his complaint but the subparagraphs he specifies do not correspond precisely to the regulation as it exists now or as it existed in 2010. The Court presumes he intended to list 49 C.F.R. § 225.33*(a)*(1), rather than § 225.33(1) and § 225.33(i). Regardless, which regulations NSR was alleged to have violated by the FRA is immaterial to resolution of the instant motion.

States filed a statement of interest pursuant to 28 U.S.C. § 517 on behalf of the DOL, which administers and enforces the relevant statutory section at issue (Court File No. 44).

## II.    STANDARD OF REVIEW

The parties dispute the proper standard of review in this case. NSR filed its motion pursuant to Fed. R. Civ. P. 12(b)(1), which addresses whether the district court has subject matter jurisdiction over a plaintiff's claims. Plaintiff, on the other hand, argues NSR's motion should have been filed pursuant to Fed. R. Civ. P. 12(b)(6), which addresses whether a complaint states a claim upon which relief can be granted. Moreover, because NSR attached declarations to its motion, Plaintiff argues the motion was effectively converted to a Fed. R. Civ. P. 56 motion for summary judgment.

Plaintiff points to *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006), in which the Supreme Court held a provision of Title VII of the Civil Rights Act of 1964 was not jurisdictional. Title VII only applies to employers who have fifteen or more employees. The parties in *Arbaugh* disputed whether the fifteen-employee requirement was jurisdictional. Many courts had held it was, in what the Court described as "drive-by jurisdictional rulings." The plaintiff in *Arbaugh*, as did the plaintiff here, invoked federal-question jurisdiction under 28 U.S.C. § 1331.[4] The Court noted "[a] plaintiff properly invokes § 1331 jurisdiction when she pleads a colorable claim 'arising under' the Constitution or laws of the United States." *Arbaugh*, 546 U.S. at 513. Accordingly, the plaintiff "invoked federal-question jurisdiction under § 1331, but her case 'aris[es]' under a federal law, Title

_____

[4] Plaintiff's complaint mistakenly asserts jurisdiction under § 1331 for "Counts 3 and 4 against NS[R]" because they "are authorized to be filed in this Court by the [FRSA], 49 U.S.C. § 20109(d)(3), 29 C.F.R. § 1982.114(a)." However, Count Four is not asserted against NSR, but lists only Bull Moose as a defendant alleged to have violated unspecified state common and statutory law. Count Two, at issue here, is asserted against NSR pursuant to the FRSA. Presumably, Plaintiff intended to state as much in his complaint, and the omission is a typographical error.

7

VII, that specifies, as a prerequisite to its application, the existence of a particular fact, *i.e.*, 15 or more employees." *Id.* After considering the important distinctions between a dismissal based on subject-matter jurisdiction and a merits-based dismissal, the Court concluded the fifteen-employee threshold is nonjurisdictional, but rather constitutes a merits-based determination of a plaintiff's claim.

> Of course, Congress could make the employee-numerosity requirement "jurisdictional," just as it has made an amount-in-controversy threshold an ingredient of subject-matter jurisdiction in delineating diversity-of-citizenship jurisdiction under 28 U.S.C. § 1332. But neither § 1331, nor Title VII's jurisdictional provision, 42 U.S.C. § 2000e-5(f)(3) (authorizing jurisdiction over actions "brought under" Title VII), specifies any threshold ingredient akin to 28 U.S.C. § 1332's monetary floor. Instead, the 15-employee threshold appears in a separate provision that "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). Given the "unfair[ness]" and "waste of judicial resources," App. to Pet. for Cert. 47, entailed in tying the employee-numerosity requirement to subject-matter jurisdiction, we think it the sounder course to refrain from constricting § 1331 or Title VII's jurisdictional provision, 42 U.S.C. § 2000e-5(f)(3), and to leave the ball in Congress' court. If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. See *Da Silva* [*v. Kinsho Int'l Corp.*], 229 F.3d[ 358], []361 [(2d Cir. 2000)] ("Whether a disputed matter concerns jurisdiction or the merits (or occasionally both) is sometimes a close question."). But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character. Applying that readily administrable bright line to this case, we hold that the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue.

*Id.* at 514-16.

In this case, the provision of the FRSA at issue is in a separate section from the provision that confers jurisdiction on federal courts. Section 20109(d)(3) provides,

> With respect to a complaint under paragraph (1) [of subsection (d)], if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate

district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy, and which action shall, at the request of either party to such action, be tried by the court with a jury.

Subsection (f), the election of remedies provision in controversy here, states "[a]n employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier."   Whereas subsection (d)(3) clearly relates to a court's jurisdiction, subsection (f) does not invoke jurisdictional language.  Courts and litigants are duly instructed that, for instance, a court lacks jurisdiction over a claim if the Secretary of Labor issued a final decision within 210 days after the employee filed his complaint.    Courts and litigants, however, are not duly instructed that an employee's separate action or invocation of another provision of law for the same act constitutes a jurisdictional bar to suit in federal court.

NSR points to past cases that have found similar election-of-remedies provisions to be jurisdictional.  For instance, in *Stiles v. GTE Southwest, Inc.*, 128 F.3d 904, 906-07 (5th Cir. 1997), the Fifth Circuit considered a provision of the Federal Communications Act of 1934, which provides plaintiffs authority to seek damages in federal court for violations of the Act.

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

47 U.S.C. § 207.  The court concluded § 207 deprives a district court of subject matter jurisdiction over a case if the plaintiff has initiated the administrative complaint process with the Federal Communications Commission ("FCC").   Other circuits have relied on *Stiles* for the same proposition. *See Digitel, Inc. v. MCI Worldcom, Inc.*, 239 F.3d 187, 190 (2d Cir. 2001); *Mexiport, Inc. v. Frontier Commc'ns Servs., Inc.*, 253 F.3d 573, 575 (11th Cir. 2001).

9

However, contrary to the provision at issue here, § 207 more clearly structures its election-of-remedies provision as a limitation on jurisdiction. Section 207 confers upon a potential complainant a cause of action in federal court, as long as the court in question has jurisdiction over the case. Regardless of the court's otherwise competent jurisdiction, however, if the complainant seeks a remedy with the FCC, the complainant may not seek relief in district court. Unlike 49 U.S.C. § 20109(f), 47 U.S.C. § 207 "speaks" in jurisdictional terms and "refers" to the jurisdiction of the district courts. *See Arbaugh*, 546 U.S. at 515 ("[T]he 15-employee threshold appears in a separate provision that 'does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts.'") (quoting *Zipes*, 455 U.S. at 394).

NSR also points to a handful of district court cases analyzing the election-of-remedies section of the Civil Service Reform Act of 1978, 5 U.S.C. § 7121(d), under Rule 12(b)(1). Although those cases consider an election-of-remedies section, the dispositive inquiry is whether the plaintiff exhausted her administrative remedies. Due to the statutory and regulatory framework that includes § 7121, if a plaintiff first files a written grievance pursuant to a collective bargaining agreement, she may not then file an Equal Employment Opportunity ("EEO") complaint. *See Ilgenfritz v. Gates*, No. 09–1502, 2010 WL 2978090, at *6 (W.D. Pa. July 26, 2010). If a plaintiff abandons the grievance procedure and files an EEO complaint, her failure to complete the grievance procedure constitutes a failure to exhaust her administrative remedies. *Id.* at *8 ("In essence, defendant claims that plaintiff failed to exhaust her administrative remedies because she did not pursue all the necessary steps through the grievance procedure to come to court.").

Whether failure to exhaust administrative remedies constitutes a jurisdictional prerequisite or a merits-based matter is a question in flux following *Arbaugh* and *Zipes*. At least one of the cases

cited by NSR grapples with this issue, concluding

> [t]here is no precedent directly on point that addresses whether the issue presented
> here should be treated as a matter of subject-matter jurisdiction or as a matter of
> summary judgment under Rule 56. Because the court has to consider matters outside
> the Complaint, and the parties agree that there is no dispute about the applicable
> facts, this court considers the difference in the context of this case to be a matter
> without a distinction.

*Id.* at *5.[5] Indeed, the Sixth Circuit has abrogated its prior rulings that held an employee's failure

to undergo the RLA-arbitration process is jurisdictional, concluding "in the 'aftermath of *Arbaugh*,'

completion of the RLA-mandated arbitral process does not affect a district court's subject matter

jurisdiction over a claim but instead goes to the court's ability to reach the merits of a dispute and

grant relief." *Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 790 (6th Cir. 2012).

The Court concludes, based on the statutory framework and *Arbaugh*, NSR should have

moved pursuant to Rule 12(b)(6). Apparently NSR and the *Reed* court agreed, as *Reed* denied

NSR's motion for summary judgment on this issue, rather than a motion to dismiss under Rule

12(b)(1). *See Ogle v. Church of God*, 153 F. App'x 371, 375 (6th Cir. 2005) (citing *Ohio Nat'l Life

Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)); *see also Good v. Ohio Edison Co.*, 149

F.3d 413, 418 (6th Cir. 1998) ("[W]hile in practice the difference is immaterial, it is more accurate

to characterize the United States' motion that was granted by the district court as a motion to dismiss

for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) instead of a motion for summary

judgment."). However, the Court considers the difference in this case to be immaterial. The parties

dispute the meaning of the FRSA's statutory language, and do not dispute the content of Plaintiff's

---

[5] This court has discussed the conflicting precedent and altering landscape in the Sixth
Circuit on the issue of exhaustion-of-remedies as a jurisdictional prerequisite in the context of Title
VII. *See E.E.O.C. v. Care Cntrs. Mgmt. Consulting, Inc.*, – F. Supp. 2d –, 2013 WL 1811973, at *2
n.2 (E.D. Tenn. Apr. 29, 2013).

complaint. To the extent NSR's motion should be considered a Rule 12(b)(6) motion, the Court

excludes the declarations attached to the motion from its consideration. *See* Fed. R. Civ. P. 12(d).

A Rule 12(b)(6) motion should be granted when it appears "beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief." *Lewis v. ACB*

*Bus. Servs., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998). For purposes of this determination, the Court

construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all

well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th

Cir. 2007). The same deference does not extend to bare assertions of legal conclusions, however,

and the court is "not bound to accept as true a legal conclusion couched as a factual allegation."

*Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court next considers whether the factual allegations, if true, would support a claim

entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. Although a complaint need only contain

a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)), this statement must

nevertheless contain "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged," *id.* at 678. "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Plausibility as explained by the Court "is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more

than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that

12

the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III.   DISCUSSION

### A.  Statutory Background

This case involves two statutes: the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.* and the FRSA.  The RLA, enacted in 1926, "governs disputes between management and labor in the railroad industry." *Emswiler*, 691 F.3d at 785.  Railroad carriers and their employees are required to "exert every reasonable effort" to form collective bargaining agreements ("CBAs") concerning rates of pay, rules, and working conditions, and to settle all disputes. 45 U.S.C. § 152 First.  The RLA distinguishes between major and minor disputes: "Major disputes concern the formation of collective bargaining agreements, whereas minor disputes deal with the interpretation of existing CBAs." *Emswiler*, 691 F.3d at 785.  The RLA establishes mandatory arbitration for minor disputes. Initially, contractually established grievance procedures are to be used for settlement. 45 U.S.C. § 152 First, Second.  Employees and carriers must exhaust these grievance procedures.  *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 73 (2009).  CBA grievance procedures often provide for an investigation through a hearing, known generally as an "on-property hearing." *Id.* If these procedures fail, binding arbitration follows, administered by the National Railroad Adjustment Board ("NRAB") or a private arbitration panel. 45 U.S.C. § 153 First (I); *id.* at 74 ("In creating the scheme of mandatory arbitration superintended by the NRAB, the 1934 Amendment largely foreclosed litigation over minor disputes.") (internal quotation marks and alterations omitted).

The FRSA, on the other hand, is intended "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101.  In 1980,

13

Congress amended the FRSA to address retaliation against employees who engage in protected conduct. *See* Federal Railroad Safety Authorization Act of 1980, Pub. L. No. 96-423, § 10, 94 Stat. 1811. The FRSA originally required employees to assert its retaliation protections pursuant to the grievance procedures in the RLA. *See id.* Additionally, the 1980 amendment added the election-of-remedies provision at issue here, albeit in slightly altered form.

> Whenever an employee of a railroad is afforded protection under this section and under any other provision of law in connection with the same allegedly unlawful act of an employer, if such employee seeks protection he must elect either to seek relief pursuant to this section or pursuant to such other provision of law.

*Id.* When the act was redesignated to its current codification in 1994, the language of this section was changed to a similar version to its current form, but the change was not intended to be substantive. *See* Pub. L. No. 103-272, 108 Stat. 745 (1994).

Now codified at 49 U.S.C. § 20109, the retaliation provision of the FRSA was amended again in 2007 to protect employees who complain of a work-related injury or illness. 49 U.S.C. § 20109(a)(4). The 2007 amendments also eliminated the requirement that FRSA complaints be heard through the RLA's arbitration procedures, instead providing authority to the Secretary of Labor to consider retaliation complaints. 49 U.S.C. § 20109(d)(1). The Secretary of Labor has delegated that authority to the Assistant Secretary for Occupational Safety and Health ("the Assistant Secretary"). 29 C.F.R. § 1982.104. After the Assistant Secretary conducts an investigation and issues findings and a determination, either party may file an objection and seek a hearing before an Administrative Law Judge ("ALJ"). 49 U.S.C. § 20109(d)(2)(A). The parties may seek further review of the ALJ's decision by the Administrative Review Board ("ARB"). 29 C.F.R. § 1982.110(a). The ARB's decision constitutes a final order of the Secretary and is subject to review in a United States Court of Appeals. 49 U.S.C. § 20109(d)(4). However, where, as here, the Secretary does not issue a final

14

decision within 210 days after the filing of the complaint, the employee may bring an original action in a district court of the United States. 49 U.S.C. § 20109(d)(3).

The election-of-remedies provision was moved from subsection (d) to subsection (f), with slight alteration of the language.[6] Congress also added two new provisions in its 2007 amendments that clarified the FRSA did not preempt other rights against discrimination or retaliation, and employees retained rights provided in other law or CBAs. Along with the election-of-remedies provision, these three subsections constitute the statutory language primarily at issue in this case.

> (f) Election of remedies.--An employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier.
> (g) No preemption.--Nothing in this section preempts or diminishes any other safeguards against discrimination, demotion, discharge, suspension, threats, harassment, reprimand, retaliation, or any other manner of discrimination provided by Federal or State law.
> (h) Rights retained by employee.--Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any Federal or State law or under any collective bargaining agreement. The rights and remedies in this section may not be waived by any agreement, policy, form, or condition of employment.

49 U.S.C. § 20109.

### B. Parties' Positions

NSR's argument is relatively simple: Section 20109(f) precludes any employee from seeking relief under both the FRSA and another provision of law for the same act of the railroad carrier. Because Plaintiff sought relief from his dismissal pursuant to the provisions of the RLA, he is barred

---

[6] The 1994 language was as follows: "An employee of a railroad carrier may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the carrier." The 2007 amendment removed the phrase "of a railroad carrier" following "employee" and inserted the qualifier "railroad" before "carrier" at the end of the sentence. To the extent this alteration had any substantive effect, it is not relevant in this case.

from now seeking relief for the alleged retaliation under the FRSA. Breaking the election-of-remedies provision into three elements, NSR argues Plaintiff (1) sought protection; (2) under another provision of law—in this case, the RLA; and (3) did so for the same unlawful act he now alleges violated the FRSA—his dismissal. Given the simplicity of this argument, NSR spends the majority of its brief countering expected arguments of Plaintiff.

Plaintiff argues the election-of-remedies provision does not preclude him from asserting his rights in this case for a number of reasons. First, Plaintiff argues he has not sought protection under another provision of law. Reading the phrase "provision of law" to mean some statutory or common law source, Plaintiff argues his grievance sought protection under the substantive rights created by the CBA. The RLA merely creates a framework for resolving claims arising from those substantive rights. Using those procedures to vindicate CBA rights does not constitute seeking protection under another provision of law. Second, Plaintiff argues the unlawful act he challenged pursuant to the RLA and the unlawful act in this case are different. When he filed a grievance with NSR, he was challenging the fairness of the investigative hearing that determined he falsified his injury. His claim under the FRSA, on the other hand, alleges NSR's decision to dismiss him was in retaliation for his reporting of the injury. Finally, Plaintiff notes his interpretation is consistent with the DOL's interpretation. At best, the election-of-remedies section is ambiguous, and if the Court were to conclude as such, it should defer to the DOL's interpretation under the doctrine announced in *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).

### C. Agency Interpretation

Similar to Plaintiff's interpretation, the DOL interprets the FRSA's election-of-remedies

16

provision to allow an employee to assert his rights under a CBA and to pursue a claim for retaliation under § 20109(f) simultaneously. Focusing, as Plaintiff does, on both the language of the statute and Congress' intent in enacting the 2007 amendments, the DOL interprets "another provision of law" to exclude contractual rights created by a CBA. Further, the DOL interprets the phrase "same allegedly unlawful act" to differentiate between the conduct prohibited by the FRSA and conduct either prohibited or mandated by a CBA. The DOL also argues it is entitled to *Chevron* deference as the administrative agency tasked with enforcing and administering the relevant statute.

### D. *Reed* decision

As noted above, shortly after the parties' briefs were submitted, a district court in the Northern District of Illinois issued a decision addressing this question. In *Reed*, NSR investigated the plaintiff for violating a safety rule. NSR terminated the plaintiff's employment after the investigation concluded he made false and inconsistent statements in reporting an injury. As Plaintiff did here, the plaintiff in *Reed* appealed the determination pursuant to the requirements of the RLA. After his internal appeal was denied, he sought relief from a Public Law Board, which reinstated him, concluding the grounds for his dismissal were insufficient. Just as Plaintiff did in this case, the *Reed* plaintiff had previously filed a claim with OSHA alleging NSR retaliated against him in violation of the FRSA. After the plaintiff filed in district court, NSR moved for summary judgment on his claim for the same reason it moves to dismiss here.

The *Reed* court denied NSR's motion. The court cited *Graf v. Elgin, Joliet and Eastern Railway Co.*, 697 F.2d 771, 776 (7th Cir. 1983), for the proposition a right created by a CBA is not the same as a right created by another provision of law. *See id.* ("Nor does the fact that an activity is regulated by a federal statute, as collective bargaining in the railroad industry is regulated by the

Case 1:12-cv-00402-CLC-WBC   Document 53   Filed 07/25/13   Page 17 of 30   PageID #: 640

[RLA], mean that disputes between private parties engaged in that activity arise under the statute."); *see also Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52-53 (1974) (noting contractual rights under a CBA and statutory rights have "legally independent origins"). The court concluded the plaintiff sought review before a board that was only empowered to consider the terms of the CBA, and that his right to termination for just cause does not arise from the RLA but from the substantive provisions of the CBA. The court also considered § 20109(h), which provides nothing in that section should be deemed to diminish rights under a CBA. Accordingly, the plaintiff did not seek relief under "another provision of law."

Although the court concluded the phrase "another provision of law" does not include enforcing rights of a CBA under the RLA's procedures, the court conceded the election-of-remedies provision was ambiguous. The court then deferred to the DOL's interpretation pursuant to *Chevron*.

### E. Application

As quoted above, the statutory text at issue in this case provides "[a]n employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier." 49 U.S.C. § 20109(f). The parties dispute the meaning of two clauses of this statute: (1) "another provision of law"; and (2) "for the same allegedly unlawful act." Because the Court concludes RLA arbitration does not constitute "another provision of law," it need not consider the second clause. The parties also dispute the extent to which the Court should defer to the DOL's interpretation pursuant to *Chevron*. However, the Court will not consider *Chevron* because it does not find the statute ambiguous.

#### 1. Statutory Language

Where the Court considers "[a] matter requiring statutory interpretation[,] . . . the starting

18

point for interpretation is the language of the statute itself." *Roberts v. Hamer*, 655 F.3d 578, 582 (6th Cir. 2011) (quoting *United States v. Brown*, 639 F.3d 735, 737 (6th Cir. 2011)). Beginning with the statutory language, the phrase "another provision of law" must be read in the context of the whole section. Section 20109(f) precludes an employee from seeking protection under "both this section and another provision of law." This language presents an equivalence between the section at issue, § 20109(f), and the other hypothetical provision of law. The word "another" as an adjective carries two, dichotomous definitions: It means an additional noun of a different kind, or an additional noun of the same kind. For instance, Webster's Third New International Dictionary provides two definitions for the adjective another: (1) "different or distinct from the one first named or considered"; and (2) "being one more in addition to one or a number of the same kind." The statute in this case uses "another" as defined in the second definition; its use of "both" preceding "this section" as well as the conjunctive "and" between "this section" and "another provision of law" indicate a similarity in kind between the two provisions of law. *Compare* Webster's Third New International Dictionary 89 (1993) (giving as example for the first definition "the same scene viewed from [another] angle") *with id.* (giving as example for the second definition "have [another] slice of cake"). Thus the second provision of law should be similar in kind to § 20109.

The CBA, in contrast with § 20109, involves contractual rights. Indeed, as the Supreme Court has recognized, in the RLA dispute-resolution process, "major disputes seek to create contractual rights, minor disputes to enforce them." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253 (1994) (quoting *Consol. Rail Corp. (Conrail) v. Ry. Labor Execs. Ass'n*, 491 U.S. 299 (1989)). The Restatement (Second) of Contracts § 1 defines contract as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way

19

recognizes as a duty." Contractual rights, according to this definition, are not themselves provisions of *law*. They are agreements or promises for which the law provides a remedy if the agreement or promise is breached.

NSR does not argue the provisions of the CBA constitute provisions of law. Rather, NSR argues Plaintiff sought relief under the provisions of the RLA when he appealed NSR's on-property determination through the RLA-mandated arbitration procedures. According to NSR, requiring the "provision" of law also to be the *source* of the substantive right impermissibly adds language to the statute. Moreover, the RLA's arbitration requirements are statutory, and Plaintiff sought protection through that statutory framework. By example, NSR points to 42 U.S.C. § 1983. Section 1983 is not a source of substantive rights. Section 1983 merely provides a cause of action to vindicate federal rights violated by state actors. NSR cites a number of cases in which courts refer to § 1983 plaintiffs as seeking some form of protection under the statute. *See, e.g.*, *Wilson v. Thompson*, 638 F.2d 799, 800 (5th Cir. 1981) (appellants had sought "federal injunctive protection, pursuant to 42 U.S.C. 1983, against their prosecution in the belief that appellee had violated" their rights under the First Amendment).

But NSR ignores the equivalence in the statute highlighted above. The word "another" implies the second provision of law should be similar in kind to § 20109. Unlike § 1983, § 20109 *does* create a substantive right. The Court's interpretation is supported by the following section:

> (h) Rights retained by employee.--Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any Federal or State law or under any collective bargaining agreement. The rights and remedies in this section may not be waived by any agreement, policy, form, or condition of employment.

49 U.S.C. § 20109. With the disjunctive "or" in subsection (h), the statute distinguishes between

"Federal or State law" and rights or remedies held "under any collective bargaining agreement."[7]

More succinctly stated, § 20109 distinguishes between legal remedies and CBA remedies. This

distinction is telling because § 20109 applies to rail carrier employees, *see* § 20109(a), and any CBA

between rail carrier employees and rail carriers will be governed by the RLA, *see* 45 U.S.C. § 152

First.[8]   Any CBA remedies between such parties must be RLA remedies, including statutory

arbitration.   Thus the statute itself distinguishes between RLA remedies and those provided under

Federal or State law.

NSR vigorously argues its interpretation does not relate to the initial "on-property" hearings

and investigations in CBAs, but merely the subsequent arbitration as mandated by the RLA. There

is support for NSR's position the arbitration procedures stem from the RLA, not from the contract

itself.   *See Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 323 (1972) ("[T]he

compulsory character of the administrative remedy provided by the [RLA] for disputes such as that

between petitioner and respondent stems not from any contractual undertaking between the parties

---

[7] The Court notes the significance of "or" in a statute depends on the statutory context.  For
instance, in *Hawaiian Airlines*, the Court considered the use of "or" in the preemption provision of
the RLA.  The appellant argued the statute's reference to "disputes . . . growing out of grievances,
or out of the interpretation or application of [CBAs]," 45 U.S.C. § 153 First(i), demonstrated
Congress' intention to preempt all grievances, even those based on state law.  The Court concluded
"or" was not determinative in that context because the appellant's argument involved considerable
overlap: If "grievances" includes all disputes between employees and railroads, it necessarily
includes interpretation or application of CBAs.  *Hawaiian Airlines*, 512 U.S. at 253-54.  The
argument made the phrase following "or" mere surplusage.  Here, on the other hand, the Court's
interpretation creates no such overlap.  In fact, because the vast majority of the CBAs addressed in
subsection (h) will be governed by the RLA, NSR's theory would create substantial overlap between
the two clauses.

[8] Although § 20109 now also applies to employees of a rail carrier's contractors or
subcontractors whose CBAs may not be subject to the RLA, *see* § 20109(a), the language of §
20109(h) refers to "any" CBA, which necessarily includes CBAs governed by the RLA.

21

but from the Act itself . . . .").  However, the remedies provided for CBA disputes, including both internal and arbitration procedures, all fall under the umbrella of "RLA mechanisms." *See Hawaiian Airlines*, 512 U.S. at 253 ("Petitioners contend that the conflict over respondent's firing is a minor dispute. If so, it must be resolved only through the RLA mechanisms, including the carrier's internal dispute-resolution processes and an adjustment board established by the employer and the unions.") (citing 45 U.S.C. § 184).  The RLA requires the employee and the rail carrier to exhaust internal grievance procedures before entering RLA-mandated arbitration. *See* 45 U.S.C. § 152 First, Second; *Union Pacific*, 558 U.S. at 73 ("[T]he RLA requires employees and carriers, before resorting to arbitration, to exhaust the grievance procedures specified in the collective-bargaining agreement . . ."); *Emswiler*, 691 F.3d at 785 ("[T]he RLA provides initially for settlement through contractually agreed-upon grievance procedures; these are sometimes referred to as 'on the property' remedies."). Exhaustion of both is then required before resort to court review, *see* 45 U.S.C. § 153, First(q); *Union Pacific*, 558 U.S. at 75, which is further limited to review of compliance with the RLA, to the NRAB panel's jurisdiction, or to fraud in the panel, *Union Pacific*, 558 U.S. at 75. Moreover, the creation of the CBA itself is a, if not the, central purpose of the RLA, *see Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377-78 (1969) (referring to the obligation to seek agreement as "[t]he heart of the [RLA]"), and the entire framework for settlement of both "minor disputes" involving application of these agreements and "major disputes" involving their formation and amendment is provided by the RLA.

NSR's attempt to ferret out the RLA-arbitration process as "statutory" and distinguish that process from the extensive framework created by the RLA creates a false distinction.  The *entire* framework is statutory.  But the rights a plaintiff seeks to enforce are not.  Throughout the entire

process, the substantive provisions at issue–the provisions that create rights and pursuant to which Plaintiff in this case sought relief– are not provisions of *law*. They are, as noted, contractual rights governed by the framework of the RLA, as opposed to contract law. And it is those rights, not the RLA, under which Plaintiff sought protection.

This point is demonstrated quite clearly by the statutory history. Between 1980 and 2007, as noted above, an FRSA retaliation claim relating to any dispute, grievance, or claim was enforced *solely* pursuant to the RLA. *See* Pub. L. No. 96-423, § 10, 94 Stat. 1811 ("Any dispute, grievance, or claim arising under this section shall be subject to resolution in accordance with the procedures set forth in section 3 of the Railway Labor Act (45 U.S.C. 153)."); *see also* H.R. Rep. No. 96-1025 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3830, 3832 ("The protections provided for in the paragraph above [discussing retaliation discrimination] would be enforced *solely* through the existing grievance procedures provided for in Section 3 of the Railway Labor Act, including the Adjustment Board, its divisions, and the 'Public Law Boards.'") (emphasis added). Although reworded in 1994 and 2007, the election-of-remedies provision has not undergone substantive change since its initial enactment.[9] When Congress enacted the election-of-remedies section, it required any employee who sought protection under the retaliation provision of the FRSA to do so pursuant to the RLA. If the phrase "another provision of law" included RLA arbitration, § 20109 would have been effectively unenforceable between the addition of the election-of-remedies section in 1980 and the 2007 amendments that removed such claims from the RLA-arbitration structure.

NSR argues this fact does not alter its interpretation. In 1980, seeking protection under the

---

[9] The Court does not offer opinion on the extent to which removing "rail carrier" as a qualifier for "employee" expanded the substantive reach of the section. Suffice it to say the Court notes the language has not undergone *relevant* substantive change since its enactment.

23

FRSA *was* seeking protection pursuant to the RLA; "this section" assumed use of the RLA's arbitration procedures and could not have been "another provision of law." Now that Congress has separated the acts, NSR argues, seeking protection under the FRSA no longer includes the RLA-arbitration procedures and accordingly those procedures now constitute "another provision of law."

However, FRSA targets an industry that participates in CBAs as a matter of course, and does so at the behest of Congress by way of the RLA. Congress understood when amending the FRSA many, if not the vast majority, of the individuals seeking protection from whistleblower discrimination will also have claims related to RLA-governed CBAs. Prior to the 2007 amendments, employees were fully capable of asserting all these rights, both contractual and pursuant to the FRSA. *See Norfolk Southern Ry. Co. v. Solis*, – F. Supp. 2d –, No. 12–0306 (BJR), 2013 WL 39226, at *10 (D.D.C. Jan. 3, 2013) ("Until the 2007 amendments, retaliation claims were pursued before an RLA § 3 arbitration board; therefore, retaliation claims and complaints pursuant to an employee's CBA were pursued in one action."). Under NSR's interpretation, the 2007 amendments cryptically changed that structure. Now, employees must pick their poison: either enforce the CBA through arbitration, or seek recompense for unlawful retaliation. The Court would expect such a change in the regulatory structure to be more clearly stated, and not left hiding behind decades-old statutory language, which before amendment to another subsection could not logically have meant what NSR now suggests it does. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 147 (2000) ("Given the economic and political significance of the tobacco industry at the time, it is extremely unlikely that Congress could have intended to place tobacco within the ambit of the [Food, Drug, and Cosmetic Act] absent any discussion of the matter."); *see also Solis*, 2013 WL 39226, at *10 ("It would be highly inconsistent with the 2007 amendments for Congress, by

transferring retaliation claims to the Secretary, to limit the ability to engage in RLA arbitration and pursue a separate retaliation claim under FRSA without further clarification."). Such a result would be even more surprising considering Congress added subsection (h), which explicitly preserved CBA "remedies," that is, preserved the employee's right to appeal through the RLA-arbitration structure.

NSR's interpretation also conflicts with Congress' intent behind the 2007 amendments. The broad purpose of the FRSA is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The 2007 amendments, which under NSR's theory would operate to preclude simultaneous enforcement of § 20109 and resort to the RLA-arbitration procedures, were intended to provide *more* protection to employees:

> The Conference notes that railroad carrier employees must be protected when reporting a safety or security threat or refusing to work when confronted by a hazardous safety or security condition to enhance the oversight measures that improve transparency and accountability of the railroad carriers. The Conference, through this provision, intends to protect covered employees in the course of their ordinary duties. The intent of this provision is to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers.

H.R. Rep. No. 110-259 (2007) (Conf. Rep.), *reprinted in* 2007 U.S.C.C.A.N. 119, 181. If NSR's interpretation were adopted, employees would face a choice between whistleblower protection and seeking review of CBA rights. Forcing an employee into such a choice will result in fewer § 20109 actions, and potentially insulate rail carriers from administrative or judicial review of retaliatory conduct. In this context, it is clear the RLA-arbitration procedure is not itself a "provision of law" as that phrase is used in the FRSA.

NSR also relies on *Norfolk and Western Railway Co. v. American Train Dispatchers Association ("Dispatchers")*, 499 U.S. 117 (1991). In *Dispatchers*, the Court was called to consider a section of the Interstate Commerce Act, 49 U.S.C. §§ 11301 *et seq.* that exempts certain

25

transactions from "antitrust laws and from all other law, including State and municipal law." 49

U.S.C. § 11341(a). Focusing on the phrase "all other law," the Court concluded the section

exempted the transactions from contract law.

> The exemption is broad enough to include laws that govern the obligations imposed by contract. "The obligation of a contract is 'the law which binds the parties to perform their agreement.'" *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 429, 54 S.Ct. 231, 237, 78 L.Ed. 413 (1934) (quoting *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 197, 4 L.Ed. 529 (1819)). A contract depends on a regime of common and statutory law for its effectiveness and enforcement.
>> "Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms. This principle embraces alike those laws which affect its construction and those which affect its enforcement or discharge." *Farmers and Merchants Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649, 660, 43 S.Ct. 651, 655, 67 L.Ed. 1157 (1923).
>> A contract has no legal force apart from the law that acknowledges its binding character. As a result, the exemption in § 11341(a) from "all other law" effects an override of contractual obligations, as necessary to carry out an approved transaction, by suspending application of the law that makes the contract binding.

*Dispatchers,* 499 U.S. at 129-30. The Court thus concluded "the obligations imposed by the law that

gives force to the carriers' collective-bargaining agreements, the RLA, do not survive the merger

in this case." *Id.* at 131.

The statute in *Dispatchers* provided the Interstate Commerce Commission the power to

override the obligations under a CBA as made binding by the RLA. The statute's broad reach was

emphasized by the Court:

> [T]he otherwise general term "all other law" "includ[es]" (but is not limited to) "State and municipal law." This shows that "all other law" refers to more than laws related to antitrust. Also, the fact that "all other law" entails more than "the antitrust laws," but is not limited to "State and municipal law," reinforces the conclusion, inherent in the word "all," that the phrase "all other law" includes federal law other than the antitrust laws. In short, the immunity provision in § 11341 means what it says: A carrier is exempt from *all law* as necessary to carry out an ICC-approved

transaction.

*Dispatchers*, 499 U.S. at 129 (emphasis in original). The statute at issue here is distinguishable. The phrase "another provision of law" is narrower than the phrase "all other law." The use of the word "another" produces an equivalence between the hypothetical second provision at issue and § 20109. Nor is the statute at issue here so broadly written to include "all other law." The word "provision" implies the reach of the statute falls short of preempting an entire body of law: A "provision" is "[a] clause in a statute, contract, or other legal instrument." Black's Law Dictionary (9th ed. 2009). Congress' use of "all other law" in the Interstate Commerce Act demonstrates its cognizance of how to enact broad-based exemptions. Here, on the other hand, Congress targeted only similar "provisions" of law.

The purpose of the statute drove the *Dispatchers* Court's interpretation, as is apparent from the Court's conclusion the statute exempted carriers from "all law as necessary to carry out an ICC-approved transaction." In fact, the Court later considered the impact of *Dispatchers* on a statute that provides "no State . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier. . . ." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 222-23 (1995) (citing the statute in its prior codification at 49 U.S.C. § 1305(a)(1)). The Court concluded terms and conditions between airlines and passengers were "privately ordered obligations" and did not involve an enactment or enforcement of a law, rule, regulation, standard, or other provision. The Court distinguished its then-recent decision in *Dispatchers*.

> American notes that in *Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117, 129, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991), the Court read the word "law" in a statutory exemption, 49 U.S.C. § 11341(a), to include "laws that govern the obligations imposed by contract." But that statute and case are not comparable to the

27

statute and case before us. *Norfolk & Western* concerned the authority of the Interstate Commerce Commission (ICC) to approve rail carrier consolidations. A carrier participating in an ICC-approved consolidation is exempt "from the antitrust laws and from all other law . . . as necessary to let [the participant] carry out the transaction." 49 U.S.C. § 11341(a). We read the exemption clause to empower the ICC to override, individually, a carrier's obligations under a collective-bargaining agreement. Our reading accorded with the ICC's and "ma[de] sense of the consolidation provisions," 499 U.S., at 132, 111 S.Ct., at 1165: "If § 11341(a) did not apply to bargaining agreements . . . , rail carrier consolidations would be difficult, if not impossible, to achieve," *id.*, at 133, 111 S.Ct., at 1165. Similarly in this case, our reading of the statutory formulation accords with that of the superintending agency, here, the DOT, and is necessary to make sense of the statute as a whole.

*Wolens*, 513 U.S. at 229 n.6.  The Court has thus cabined *Dispatchers* to the statutory context and the intent of the statute at issue.  Here, as already explained, the purpose of the FRSA would be impeded by interpreting the election-of-remedies provision to extend to the RLA.

The phrase "another provision of law" could not include the RLA, which was § 20109's minor-dispute enforcement mechanism for the majority of its existence.  Reading the phrase "another provision of law" to include the RLA-arbitration structure ignores the statute's history.  NSR contends the 2007 amendments, which removed § 20109 from the RLA structure, implicitly amended the election-of-remedies section to include the RLA as "another provision of law."  But for the reasons already discussed, that interpretation conflicts with the statutory history and congressional intent.  Accordingly, the Court concludes NSR's interpretation of § 20109(f) conflicts with the statutory language, its history and prior iterations, and relevant legislative materials.  Plaintiff did not waive his FRSA retaliation rights when he entered RLA arbitration.

### 2. *Chevron*

The parties and the DOL dispute whether *Chevron* deference is appropriate in this case. *Chevron* requires courts to defer to reasonable agency interpretations of ambiguous statutes if the

agency is primarily charged with enforcement of the statute. Under the *Chevron* two-step inquiry, courts first determine whether Congress has directly spoken to the precise question at issue. *Mid-America Care Found. v. Nat'l Labor Relations Bd.*, 148 F.3d 638, 642 (6th Cir. 1998). If the court concludes Congress has, it must give effect to the will of Congress without regard to the agency's interpretation. Where the statute is silent or ambiguous on a given issue, however, courts consider whether the agency's interpretation is a permissible construction of the statute. *Id.* If the court finds it is, the court will defer to the agency's interpretation.

NSR disputes the appropriateness of *Chevron* deference in this case on a number of grounds. However, the Court need not consider these issues. "An agency's interpretation is not entitled to *Chevron* deference . . . if the apparent statutory ambiguity can be resolve using 'traditional tools of statutory construction.'" *Id.* at 642 (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 (1987)); *see also Greenbaum v. U.S. Envtl. Prot. Agency*, 370 F.3d 527, 535 (6th Cir 2004). The Court concludes, for the reasons discussed above, any ambiguity in the phrase "another provision of law" is resolved by traditional tools of statutory construction, including the relevant statutory context. *See Greenbaum*, 370 F.3d at 535-36 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole.") (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000)). Indeed, it is unclear the extent to which the DOL argues the Court should defer, rather than conclude outright the statute unambiguously supports Plaintiff's position (*see* Court File No. 44, Statement of Interest, p. 20) ("Assuming, *arguendo*, that § 20109(f) is ambiguous, DOL ARB's *Koger/Mercier* decision is

29

entitled to deference . . . .") (italics in original). Nor does *Chevron* have a substantive impact on this case, as the Court's interpretation of the statute is the same as the agency's. Accordingly, the Court does not consider the *Chevron* arguments offered by the parties.

### 3. Oral Argument

After all briefs were submitted, NSR filed a motion for oral argument on this issue (Court File No. 49). NSR relies on its view this case involves a jurisdictional question. The Court has, however, concluded the election-of-remedies provision of the FRSA is nonjurisdictional. NSR also argues oral argument is necessary due to the complexity of the arguments. However, the Court does not require oral argument in this case, as it understands the arbitration requirements of the RLA, and is aware of the distinction NSR draws between grievance procedures and RLA-arbitration appeals. Moreover, because the Court will not defer pursuant to *Chevron*, it need not consider the many points NSR offers in opposition to such deference. The Court concludes oral argument is not needed on this question and will **DENY** NSR's motion (Court File No. 49).

## IV. CONCLUSION

For the foregoing reasons, the Court will **DENY** NSR's motion to dismiss Count Two (Court File No. 16).

**An order shall enter.**

/s/_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

30